916 P.2d 1164

Maria B. STYLES and Charles E. Styles, wife and husband, Plaintiffs–Appellees,

v.

Walter A. CERANSKI, M.D. and Cathy Ceranski, husband and wife, and Walter A. Ceranski, M.D., LTD., an Arizona corporation, Defendants–Appellants.

No. 1 CA–CV 93–0450.

Court of Appeals of Arizona, Division 1, Department A.

Jan. 9, 1996.

Reconsideration Denied March 14, 1996.

Petition for Review Withdrawn May 30, 1996.

Harris & Palumbo, P.C. by John D. Harris and Gene M. Cullan, Phoenix, and Steptoe & Johnson by Bruce E. Meyerson and Mark A. Fuller, Phoenix, for Plaintiffs–Appellees.

Weyl, Guyer, MacBan & Olson, P.A. by Barry A. MacBan and Jolane D. Veeder, Phoenix, and Mitten, Goodwin & Raup by Donald F. Froeb, Phoenix, for Defendants–Appellants.

## OPINION

NOYES, Presiding Judge.

Walter A. Ceranski, M.D., Cathy Ceranski, and Walter A. Ceranski, M.D., Ltd. appeal from a judgment entered on a jury's verdict holding Dr. Ceranski solely at fault for an unnecessary pancreatectomy performed by Dr. Attila S. Szokol on Appellee Maria B. Styles. Because there is no evidentiary support for a verdict that Dr. Ceranski was at fault but Dr. Szokol was not, we reverse the judgment. Because the liability and damages issues were intertwined, and were both impacted by the trial court's error in allowing three of Styles' damages witnesses to become standard of care witnesses as well, we remand for new trial on all liability and damages issues. Because none of the errors at trial affected the statute of limitations defense, we affirm the jury's finding that Styles' claims were not time-barred.

## I

The events that led to this lawsuit began on August 17, 1983, when Styles went to the hospital with acute abdominal pain. Dr. Ceranski, a board-certified family physician, was called in because he had been Styles' treating physician since September 1982. The next day, Ceranski asked three gastroenterologists to help diagnose her condition. One found Styles' complaints consistent with those she had been making since 1977 and noted, "Rule out pancreatitis." Another noted, "I suspect she is ventral pancreas (pancreas divisum), which can be associated with chronic pancreatitis."

Dr. Szokol, a board-certified general surgeon, was also called in to see Styles, his former patient. In 1977 and 1979, Szokol had removed Styles' appendix and gallbladder in response to her complaints of abdominal pain. In the 1983 consultation, Szokol diagnosed chronic pancreatitis and recommended surgery. Szokol told Ceranski that a pancreatectomy was probably the procedure of choice, but he would not know what to resect until he was in surgery. Ceranski approved an exploratory laparotomy, with pancreatectomy at the discretion of Szokol.

Styles signed a form consenting to "exploratory laparotomy with pancreatectomy, possible hemorrhoidectomy." Szokol contended that he explained to Styles the test results, the diagnosis, the surgery, and the related complications. Styles contended that the doctors did not explain anything; they just said they could cure her pain.

On August 26 Szokol operated on Styles, assisted by a board-certified surgeon as first assistant and Ceranski as second assistant. When Szokol saw the pancreas and concluded that it was abnormal, he removed ninety percent of the pancreas and all of the spleen. At trial, Styles proved that the pancreas was normal, that it should not have been removed, and that its removal caused her to become diabetic.

After discharge from the hospital on September 5, 1983, Styles saw Ceranski for follow-up care until August 1987, when she began going to the Mayo Clinic and there learned that her diabetes had been caused by the pancreatectomy. In January 1989, Styles and her husband brought this medical malpractice action against Szokol and Ceranski and their corporations and spouses (and others who were dismissed), claiming that the defendant doctors inaccurately diagnosed chronic pancreatitis and performed an unnecessary pancreatectomy that made her an insulin-dependent diabetic.

The claims against Szokol went to binding arbitration on the issue of damages, Szokol having admitted fault for purposes of that proceeding. The arbitration panel awarded Styles and her husband $825,000 in damages against Szokol, who then settled with Styles. Later, when the case proceeded to jury trial, Ceranski argued that Szokol was a non-party at fault, and Styles argued that the jury

should assign all fault to Ceranski and award Styles no less than four million dollars in damages. The jury did just that; the verdict assigned all fault to Ceranski and awarded Styles four million dollars in damages. The jury also found that Styles' complaint was not time-barred. The court entered judgment and denied Appellants' motion for new trial. We have jurisdiction of the appeal pursuant to Arizona Revised Statutes Annotated ("A.R.S.") sections 12–2101(B) and (F)(1) (1994).

## II

■ A motion for new trial on grounds that the verdict is against the weight of the evidence is within the sound discretion of the trial court. The trial court's denial of the motion will be reversed only if it reflects a manifest abuse of discretion given the record and circumstances of the case. *Blakely Oil, Inc. v. Wells Truckways, Ltd.*, 83 Ariz. 274, 278, 320 P.2d 464, 466 (1958). In reviewing a jury verdict, we view the evidence in a light most favorable to sustaining the verdict, and if any substantial evidence could lead reasonable persons to find the ultimate facts sufficient to support the verdict, we will affirm the judgment. *Curlee v. Morris*, 72 Ariz. 125, 127, 231 P.2d 752, 753 (1951). However, "it is not only our right, but our duty, to set aside a verdict" if there is no evidence in the record to justify it. *Spain v. Griffith*, 42 Ariz. 304, 305, 25 P.2d 551, 551 (1933).

■ We find absolutely no evidence to justify a conclusion that Ceranski was at fault but Szokol was not. Styles' main injury was caused by the unnecessary removal of her pancreas, and it was undisputed that Szokol was the one who decided to remove her pancreas. If Ceranski was at fault for this surgery, so was Szokol.

At trial, Ceranski attempted to show that he had met the standard of care by calling in physicians with more expertise (three gastroenterologists and surgeon Szokol) when he himself could not determine the cause of Styles' abdominal complaints. Styles countered by arguing that Ceranski, as the family physician, was responsible for her overall care and the supervision of consulting physicians, and bore the ultimate responsibility for

any misdiagnosis or treatment she received. The jury's verdict reflects total acceptance of this theory, but this theory is no justification for disregarding the undisputed role—and fault—of Szokol in this unnecessary surgery.

Styles argues that Ceranski never faulted Szokol. This is true, but Ceranski did not exonerate Szokol; he merely said that he, Ceranski, a family physician, did not feel qualified to criticize a surgeon's operating-room decisions. All of the experts who did feel qualified to criticize Szokol did so in clear terms. Styles' standard of care expert, Dr. Moossa, testified that Ceranski had a majority of the fault pre-operatively and post-operatively, but that Szokol was in charge during surgery and was the one at fault for removing a normal pancreas. Dr. Moossa identified nine specific ways in which Szokol fell below the standard of care in treating Styles. Ceranski's standard of care expert, Dr. Price, testified that the surgeon is responsible for the surgery and for the surgical care of the patient. Szokol himself admitted that he was in charge of getting Styles ready for surgery, he was in charge of Styles during surgery, he was the one who "made the decision" to remove her pancreas, and he made this decision without consulting Ceranski.

In denying the motion for new trial, the trial court found that the jury's failure to assign any fault to Szokol could be explained by the fact that Szokol did not admit fault and Ceranski did not fault Szokol. As discussed above, Ceranski did not exonerate Szokol; he just did not feel qualified to criticize him. And the reason that Szokol did not admit fault (in this trial) was that he believed he had done nothing wrong by removing Styles' pancreas. Styles' experts ridiculed this opinion, and the damages verdict makes plain that the jury rejected this opinion.

During oral argument on the motion for new trial, the trial court said to counsel, "there's only one person in the courtroom who didn't think Szokol was at fault.... And that's Dr. Ceranski." To which Ceranski's counsel accurately responded, "And his testimony was, 'I'm not qualified to render that opinion.'" But in its minute entry deny-

ing the motion for new trial, the court found that "a jury could rationally decide that Dr. Szokol was not at fault." On this record, however, a jury could not rationally decide that only the surgeon's second assistant was at fault for the surgeon's decision to remove a normal pancreas.

In the minute entry denying the motion for new trial, the court found that the evidence of negligence and causation was "overwhelming." If that is true for Ceranski, it must also be true for Szokol. Styles' liability theory concerning Ceranski, in the main, was that Szokol's diagnosis of chronic pancreatitis and his recommendation for surgery were such patently unfounded decisions that even a family physician such as Ceranski should have known it. For example, Dr. Moossa testified that Szokol's diagnosis of chronic pancreatitis "was totally wrong, and the evidence thus far is that Ceranski should have challenged that opinion or should have asked for some explanation." According to Dr. Moossa, "[i]f Ceranski had done his job, Szokol would never have gotten to her." In Dr. Moossa's opinion, anyone who agreed with Szokol's recommendation for surgery was in "cuckoo land." If that is where Ceranski was, he got there by following Szokol.

The trial court also upheld the verdict on the theory that "as is the case generally with comparative negligence of a party, a jury is free to disregard evidence of fault of a nonparty." We find this to be an incorrect proposition of law. An Arizona jury is free to disregard evidence of *plaintiff's* fault because of Arizona Constitution article 18, section 5, which provides: "The defense of contributory negligence or of assumption of risk shall, in all cases, whatsoever, be a question of fact and shall, at all times, be left to the jury." *See Gunnerson v. Gunnerson*, 163 Ariz. 475, 476, 788 P.2d 1226, 1227 (App. 1989). There was no such defense in this case, and article 18, section 5 does not allow a jury to disregard the fault of settling defendants or properly-noticed non-parties. Arizona's comparative fault law requires that "[i]n assessing percentages of fault the trier of fact shall consider the fault of all persons who contributed to the alleged injury...." A.R.S. § 12–2506 (Supp.1995). The jury was

correctly instructed: "If you find more than one person at fault for plaintiff's injury, you must then determine the relative degrees of fault of all those whom you find to have been at fault." *See RAJI (Civil)* 2d, Fault 11. The jury was properly instructed on what it "must" do with all fault found in the case. That the jury disregarded its duty to "determine the relative degrees of fault of all those whom you find to have been at fault" is perhaps explained by Styles' final argument.

Styles stressed to the jury in final argument that, although she was not claiming that Szokol was without fault, the jury should reject any arguments about Szokol's fault because assigning any fault to Szokol just "subtracts from Maria's verdict." The jury's verdict reflects its acceptance of counsel's insidious suggestion that the way to fully compensate Styles was to, in effect, disregard any fault of Szokol and hold Ceranski liable for Szokol's fault as well as his own.

There is no justification for a verdict that Dr. Ceranski had all the fault and Dr. Szokol had none; such a verdict disregards the undisputed evidence and it disregards the applicable comparative fault law. Appellants' motion for new trial should have been granted.

### III

Styles argues that any new trial should be on comparative fault only. On this record, we disagree. Limiting a new trial to only some of the issues lies within the sound discretion of the court. *See Trus Joist Corp. v. Safeco Ins. Co. of America*, 153 Ariz. 95, 108, 735 P.2d 125, 138 (App.1986). Partial new trials are not recommended because they create much opportunity for confusion and injustice. *In re Thompson's Estate*, 1 Ariz.App. 18, 23, 398 P.2d 926, 931 (1965) (citing 66 C.J.S. New Trial § 11, pp. 89, 90). The court should consider, with a view toward the furtherance of justice, whether a second trial limited to one issue might be prejudicial to either party and should resolve any doubt in favor of a new trial on all the issues. *Id.* The retrial should be granted on both liability and damages "when the issues are interwoven and cannot be separated without injustice to the opposing party." *Anderson v. Muniz*, 21 Ariz.App. 25, 28, 515

P.2d 52, 55 (1973); *see also Saide v. Stanton,* 135 Ariz. 76, 79–80, 659 P.2d 35, 38–39 (1983).

■ Styles understandably wants to preserve the four million dollar verdict against Ceranski and limit the retrial to apportionment of fault between Ceranski and Szokol. In support of her argument that she is entitled to do so, she cites *Department of Corrections v. Romero,* 524 So.2d 1032 (Fla.Ct.App. 1988) and *Hierta v. General Motors Corp.,* 148 Mich.App. 796, 385 N.W.2d 690 (1986). We find both cases distinguishable. *Romero* summarily concluded that "[t]he jury's determination of damages is not affected by this opinion." 524 So.2d at 1034. We have different facts here. *Hierta* held that "[s]ince the parties received an error-free trial on the issues of liability and damages, we need only remand on the issue of comparative negligence." 385 N.W.2d at 692 (footnote omitted). As explained below, the trial was not so error-free here.

By pretrial order, each party was limited to one standard of care witness. Styles designated Dr. Moossa as her standard of care witness, and he testified as such. By the time of final argument, however, it was clear that Styles also had elicited standard of care testimony from three Mayo Clinic experts (two physicians and one nurse) who were testifying as damages witnesses. The trial court had permitted standard of care testimony from these witnesses in reliance on Styles' argument that to effectively treat the patient, the Mayo Clinic witnesses had a "need to know" what kind of care she had in the past; thus, the argument went, these damages witnesses could offer opinions about the adequacy of that previous care. Ceranski's counsel made sufficient objection to preserve the issue for appeal.

During final argument, Styles' counsel abandoned all pretext that the Mayo Clinic experts were only damages witnesses and relied heavily upon them as standard of care (liability) witnesses as well. Here are some passages from Styles' final argument:

## OPENING ARGUMENT

You've got an instruction from the Judge that said on these issues that we're entitled to only one expert witness on some of these. All right? And we chose to have Dr. Moossa address the standard of care, whether the standard of care was met by Dr. Ceranski, and, for that matter, Dr. Szokol.

But when you go back and talk about this, would somebody remember to bring up what you think Dr. Caldwell was telling you and Dr. Whitaker from the Mayo Clinic? Because, indeed, perhaps [Dr. Caldwell] defined the issues presented to you in as clear a fashion as they ever could be presented.

For instance, in taking care of Maria, he said, "I'm the quarterback." ...

....

That's Dr. Caldwell from the Mayo Clinic. He doesn't talk about passing the ball off. He doesn't talk about relinquishing responsibility.

....

[P]erhaps one of the more important things that Dr. Caldwell explained to you folks when concluding that this lady, quote, "never had chronic pancreatitis," ... was when he talked about the medical school ten-minute discussion of when you use surgery for chronic pancreatitis. And remember what the testimony was?

"Any discussion that involves surgical considerations of chronic pancreatitis involves at least nine minutes of silence."

With all due respect to Dr. Moossa, it couldn't have been said any better.

And that's the liability picture.

## REBUTTAL ARGUMENT

Secondly, what's very important in that regard [referring to the burden of proof] is with all of the allegations of negligence, of substandard care that we have made through Dr. Moossa, through Dr. Caldwell, through Dr. Whitaker, even through Beth Walker [the Mayo Clinic nurse] ... the plaintiffs need prove just one, just one. We have proved all of them....

....

We bring you Dr. Moossa, but then for insurance, if you will, we can't do any more

than to hand you the Mayo Clinic on the standard of care. Can't do any more than that.

Styles' final argument unfairly exploited trial court rulings on admission.of evidence and boldly disregarded pretrial orders limiting each party to one standard of care witness. In denying the motion for new trial, the trial court recognized a "serious issue" as to whether Styles had "improperly elicited" standard of care testimony in violation of court orders; and the trial court explicitly found that Styles' final argument was "improper." Nevertheless, the trial court concluded that the error "is not reversible because of the overwhelming evidence of negligence and causation." We respectfully suggest that one reason the evidence against Ceranski appeared so overwhelming was that Styles was erroneously allowed to call four standard of care witnesses while Ceranski was limited to one.

The size of the verdict is another factor to consider. Although the evidence supports the damages verdict, it is fair to say that the jury answered the prayers of Styles' counsel: four million dollars to Styles and all fault to Ceranski. The verdict includes full compensation for complications that the Mayo Clinic experts said Styles might possibly have in the future but had not developed in the ten years between surgery and trial. That the verdict reflects complete acceptance of "the Mayo Clinic on damages" increases our concern that the improper testimony and argument concerning "the Mayo Clinic on liability" affected the damages verdict as well.

We conclude that Styles' exploitation of the trial court's error in allowing the Mayo Clinic witnesses to testify as both damages and liability experts reflected the intertwining of those issues and probably affected the verdict on both of those issues. The proper remedy is a new trial on all liability and damages issues.

## IV

Appellants contended that Styles' action was barred by the two-year statute of limitations governing medical malpractice actions. In support of this defense, Appellants at- tempted to admit deposition testimony of Lori Manzo, a dental hygienist who had taken a history from Styles noting "borderline diabetes" in January of 1985, four years before Styles filed her complaint. The trial court excluded the deposition, finding a violation of *Duquette v. Superior Court*, 161 Ariz. 269, 778 P.2d 634 (App.1989), which held that defense counsel in a medical malpractice action may not engage in *ex parte* communications with plaintiff's treating physicians without having obtained plaintiff's consent. *Id.* at 277, 778 P.2d at 642.

The facts relevant to the *Duquette* issue are that Styles' counsel authorized defense counsel to contact Manzo; an employee of Styles' dentist, for the sole purpose of scheduling her deposition. The defense paralegal who contacted Manzo for this purpose told Manzo she could not discuss her specific recollection of Styles, but the paralegal then elicited from Manzo that her "usual practice" in taking a patient's history was to only record information volunteered by the patient. The paralegal noted that Manzo would make an "excellent witness" for the defense. When Manzo was deposed, however, she failed to recall Styles mentioning that she was "borderline diabetic," thus making Manzo's "usual practice" testimony necessary foundation for admission of the "borderline diabetic" entry in Styles' medical history.

We find no abuse of discretion by the trial court finding that the "usual practice" conversation went beyond the permissible scope of scheduling a deposition, touched upon substantive testimony, and should be excluded as a sanction for violating *Duquette*.

We further find that the jury's answer to the interrogatory on the statute of limitations defense is supported by the evidence and unaffected by any error at trial. This issue turned on the jury's finding regarding the date by which Styles knew or should have known that her diabetes was caused by removal of her pancreas. The statute of limitations issue essentially turned on credibility questions that, in our opinion, were not likely to have been affected by the errors which require new trial on the damages and liability issues.

## V

The judgment is reversed and remanded for new trial and other proceedings consistent with this opinion. The jury interrogatory rejecting the statute of limitations defense is affirmed.

CONTRERAS and GERBER, JJ., concur.