164 P.3d 667

**SALT RIVER PROJECT AGRICULTUR-AL IMPROVEMENT AND POWER DISTRICT,** an agricultural improvement district organized and existing under the laws of the State of Arizona, Plaintiff/Appellant/Cross Appellee,

v.

**MILLER PARK, L.L.C.,** an Arizona limited liability company; Miller Park II, L.L.C., an Arizona limited liability company, Defendants/Appellees/Cross Appellants.

No. 1 CA–CV 05–0730.

Court of Appeals of Arizona, Division 1, Department B.

May 15, 2007.

Review Granted Oct. 30, 2007.

Jennings Strouss & Salmon PLC By Douglas G. Zimmerman, Scottsdale, Michael J. O'Connor and John J. Egbert, Phoenix, Attorneys for Plaintiff/Appellant/Cross Appellee.

Bryan Cave LLP By Steven A. Hirsch and Rodney W. Ott, Phoenix, Attorneys for Defendant/Appellee/Cross Appellant.

## OPINION

NORRIS, Presiding Judge.

¶ 1 This appeal arises out of a lawsuit filed by Plaintiff/Appellant, Salt River Project Agricultural Improvement and Power District (SRP), to condemn real property owned by Defendants/Appellees, Miller Park, L.L.C. and Miller Park II, L.L.C. (collectively, Miller Park) for a 500,000–volt transmission line easement. On appeal, SRP and Miller Park challenge various orders entered by the superior court.

¶ 2 In its appeal, SRP argues the superior court should have allowed it to impeach Miller Park's owner's representative with evidence that 17 months before the valuation date, Miller Park had disputed the real property tax valuation assigned to the property by the county assessor and had asserted the property was worth less than $10,000 an acre when, at trial, he testified the property had a fair market value well in excess of that amount. Under the circumstances presented in this case, we hold the superior court did not abuse its discretion in barring this evidence for purposes of impeachment. Although SRP also argues this evidence should have been admitted as an admission of value by the property owner, we do not need to decide this question because it is not properly before us.

¶ 3 In a cross-appeal, Miller Park argues the superior court should have awarded it sanctions under Rule 68 because it obtained a judgment well in excess of an offer of judgment it made to, but was not accepted by, SRP. With the exception of prejudgment interest, we agree.

## FACTS AND PROCEDURAL HISTORY

¶ 4 In 1997, Miller Park purchased a parcel of undeveloped real property located south of an interchange on Interstate 10, and north of the Town of Buckeye, Arizona. In 2000, it purchased an adjacent parcel of undeveloped real property. The combined parcels, totaling approximately 200 acres, are bordered on the north by Durango Road; on the south by Lower Buckeye Road;[1] on the west by property owned by a third party; and on the east, by Miller Road, which is one of the primary roads from Interstate 10 to Buckeye. Together, the parcels roughly resemble the shape of the State of Oklahoma, with a 35–acre panhandle section in the northwest portion of the property. A 155–foot–wide easement for a 250,000–volt transmission line, owned by the Western Area Power Administration (WAPA), runs north-south and borders the east edge of the panhandle section.

¶ 5 In May and June 2000, Buckeye annexed the property with zoning that would allow for general commercial, employment, and industrial uses. In June 2001, Miller Park requested Buckeye to approve a "concept plan" for the planning and marketing of the property. By this time, Miller Park, through the efforts of its managing member, Michael Pierce, an experienced real estate developer in the Buckeye area, had brought water and sewer utility services close to the property. The Buckeye Community Planning Development Board approved Miller Park's concept plan in August 2001.

¶ 6 As approved, the concept plan authorized development of the property for general commercial, employment, and industrial uses. Miller Park's concept plan divided the property into ten parcels and envisioned 2.6 million square feet of building, with a 10.7 acre park and open-space area serviced by amenities usable by all the parcels. In accordance with then-existing town plans, the concept plan depicted Miller and Lower Buckeye Road as major arterial roads and Durango Street as a major collector street; further, the plan depicted access points on Miller Road (one), Lower Buckeye Road (one), and Durango Street (two), as well internal traffic circulation over a loop road with part of the loop road and open space running under the WAPA line.

¶ 7 Although Miller Park had initially intended to hold the property for future com-

---

1. Although the parties and the witnesses referred to Durango and Lower Buckeye as "roads," neither road had actually been constructed as of the time of trial.

mercial development, in the fall of 2001, a real estate developer, Joe Kalish, approached Pierce and expressed interest in purchasing a portion of the property. After considerable discussion and negotiation, in February 2002, Kalish, through his development company, contracted to buy the north 100 acres of the property, which included the panhandle section, for $17,424,000 ($4.00 per square foot). The purchase contract between Kalish and Miller Park required Kalish to pay the purchase price over seven years.

¶ 8 Less than a month later, on March 13, 2002, SRP informed Miller Park that it intended to construct a 500,000–volt transmission line across a portion of the property. SRP ultimately condemned a 16–acre, 100–foot–wide transmission-line easement and installed thirteen 140–to–160 foot high utility towers with power lines running between the towers in the easement area. The easement bordered the WAPA easement and included five 90–degree angled turns on or immediately adjacent to the property; the two transmission-line easements created a corridor 315 feet wide.

¶ 9 Miller Park trial witnesses described the combined transmission-line corridor as severing the panhandle section from the remainder of the property. Miller Park witnesses also explained that the SRP easement eliminated access into the property from Lower Buckeye Road.

¶ 10 Miller Park notified Kalish of SRP's proposed easement. Although Kalish had known of the existing WAPA line, he was not willing to go forward with the purchase of the north 100 acres because he believed SRP's proposed easement would isolate the panhandle section from the remainder of the property, which fronted and had access to Miller Road. In June 2002, Kalish terminated the transaction with Miller Park "due to the impending impact of [the] Salt River Project easement."

¶ 11 SRP filed its condemnation action against Miller Park on September 12, 2002. It sought and obtained an order entitling it to the immediate possession of the easement.

Discovery and disclosure went forward and the case was scheduled for trial on the issue of just compensation.

¶ 12 Before trial, Miller Park moved in limine to exclude evidence regarding Miller Park's protest of the county assessor's determination of the "full cash value" of its property for tax purposes ("tax protest"). Miller Park had retained Deloitte & Touche Property Tax Services (Deloitte) to file a petition with the county assessor requesting a review of the valuation ("tax protest material"). The tax protest material, which was filed by Deloitte on April 16, 2001, claimed that the full cash value assigned to the property by the assessor exceeded market value and was not "equitable with similar property." Over SRP's objection, the court granted the motion.

¶ 13 The case proceeded to trial. Miller Park presented testimony from Michael Pierce, Joe Kalish, and others who testified regarding the population growth in the Buckeye area, the expanding commercial and residential Buckeye real-estate markets, as well as on the effect the SRP easement had on the property and its development and future use. Pierce and Kalish discussed in detail their negotiations regarding Kalish's efforts to purchase the 100 acres.

¶ 14 Pierce and an expert appraiser retained by Miller Park, Peter Martori, testified regarding compensation for the property taken and severance damages. Pierce testified that as of September 2002, the property had a fair market value of $4.00 per square foot, and that the SRP easement had taken 90% of the value of the easement area. Using these values, he concluded $2,404,773.36 represented the value of the land taken for the easement, and that damage to the remaining portion of the Miller Park property amounted to $3,063,139.20, for a total of $5,474,620.16.[2] Martori testified the property had a fair market value as of September 2002 of $2.00 a square foot and that the SRP easement had taken 99% of the value of the easement area. He concluded that the value of the property taken by the easement was

2.  This amount also included a ten-foot-wide strip that had no value because it was too small to develop.

$1,347,812.00, with $2,512,877.00 as severance damages to the remaining property, for a total of $4,119,480.00.

¶ 15 SRP presented testimony from four witnesses. William Hanna, an employee of Arizona Public Service, testified regarding the placement of the SRP line; Kevin McDougal, a civil engineering consultant, and Eric Lander, a real-estate consultant, discussed land uses they believed would be compatible with the SRP easement; and Mark Wirth, a commercial real-estate appraiser, testified regarding compensation and severance damages. In Wirth's opinion, the property had a fair-market value of $22,000 an acre (approximately $.50 per square foot), with the easement taking 75% of the value of the easement area. Accordingly, he concluded Miller Park was entitled to $270,573 as just compensation for the easement. He stated, however, that Miller Park was not entitled to severance damages because the rest of its property had not been damaged by the easement.

¶ 16 The jury awarded Miller Park $2,467,790.37 as the fair-market value of the property taken. It also awarded $2,243,738.01 as severance damages, for a total of $4,711,528.38.

¶ 17 Following the verdict, SRP moved for a new trial, or in the alternative, a remittitur, and Miller Park moved for sanctions under Rule 68(d) based on SRP's rejection of an offer of judgment Miller Park submitted to it on April 16, 2004. The superior court denied both motions and entered judgment on the jury's verdict.

¶ 18 SRP timely appealed, and Miller Park timely cross-appealed. We have jurisdiction over SRP's appeal and Miller Park's cross-appeal pursuant to A.R.S. § 12–120.21(A)(1) (2003).

## DISCUSSION

### I. SRP's Appeal

#### A. Exclusion of the Tax Protest Material for Impeachment

■ ¶ 19 On appeal, SRP argues the superior court should have admitted the tax pro-

test material for two purposes: first, as an admission by Miller Park; second, to impeach Pierce's testimony regarding the fair market value of the property. As to the first issue, we do not need to decide it. This issue is not properly before us; in the superior court, SRP only sought to use the tax protest material to impeach Pierce if he testified about value in Miller Park's case-in-chief.

¶ 20 As to the second issue, SRP asserts the superior court's decision to bar Pierce's impeachment with the tax protest material rested solely on an opinion issued by this court, *State ex rel. Mendez v. American Support Found., Inc.*, 209 Ariz. 321, 100 P.3d 932 (App.2004), which, after the jury's verdict in this matter, was "depublished" by the Arizona Supreme Court. *State ex rel. Mendez v. American Support Found.*, 210 Ariz. 232, 109 P.3d 571 (2005); *see also* ARCAP 28(f).[3] In *American Support*, another panel of this court reversed a judgment in a condemnation action because the superior court had allowed the condemning authority to introduce tax protest material, similar to that at issue here. *American Support* held this evidence should not have been admitted because it reflected neither the market value of the property as that term is used in condemnation cases, nor the owner's actual opinion of market value for non-tax purposes. SRP argues that *American Support's* depublication means that the superior court's decision to bar SRP from impeaching Pierce with the tax protest material—made in reliance on *American Support*—became legally erroneous.

¶ 21 SRP further contends that a property owner's prior statement of value made for tax purposes is *per se* admissible to impeach the owner in a condemnation action if the owner testifies at trial regarding value. *See generally* 5 Julius L. Sackman, *Nichols on Eminent Domain* § 18.12[1] at 18–87 (Matthew Bender & Co.3d ed.2006); C.C. Marvel, Annotation, *Valuation for Taxation Purposes as Admissible to Show Value for Other*

---

**3.** Arizona Rule of Civil Appellate Procedure 28(f) states that "an opinion which has been certified for publication by the Appeals Court shall not be published, on an order to that effect by the supreme court. . . . "

*Purposes,* 39 A.L.R.2d 209 (1955). Accordingly, SRP asserts we must reverse and remand for a new trial.

¶ 22 We disagree. First, although other jurisdictions may admit tax protest material for impeachment in a condemnation action as a matter of course, this state's differing approaches for valuing property for condemnation and property tax purposes do not support the routine admission of this type of evidence for impeachment in condemnation cases. Depending on the circumstances of the particular case, it is within the superior court's discretion to determine whether tax protest material has probative value for impeachment. As we explain, that is the case here.

### 1. Condemnation and Just Compensation

■ ¶ 23 The Arizona Constitution requires payment of "just compensation" when property is taken by eminent domain. Ariz. Const. art. 2, § 17. The Arizona Supreme Court has explained that just compensation is the amount of money necessary "to put the property owner in as good a financial position as if the property had not been taken." *See e.g., City of Phoenix v. Wilson,* 200 Ariz. 2, 5, ¶ 8, 21 P.3d 388, 391 (2001). It has also explained that market value—what a willing buyer would pay and a willing seller would accept—determines valuation. *Id.* at 6, ¶ 8, 21 P.3d at 392. And, in determining market value, the finder of fact must consider the highest and best use of the land. *Id.*

■ ¶ 24 A property's highest and best use for purposes of determining market value in a condemnation action is not necessarily its current use. As our supreme court has also explained:

A valuation which does not take into consideration the highest use would not be the

fair market value and therefore would not be just compensation. . . . An owner who is making only a minor use of premises cannot be deprived of its value for a major use if that major use goes to a higher market value.

*State ex rel. Morrison v. Jay Six Cattle Co.,* 88 Ariz. 97, 102, 353 P.2d 185, 188 (1960)(quoting *County of Maricopa v. Paysnoe,* 83 Ariz. 236, 239, 319 P.2d 995, 997 (1957))(alterations in original).

### 2. The Tax System and "Full Cash Value"

¶ 25 A property's current use, not its highest and best use, is, however, at the heart of determining the market value of property for tax purposes. In Arizona, property is valued based on its "full cash value," unless otherwise prescribed by statute. *See* A.R.S. § 42–13051(B) (Supp.2006).[4] Although the state legislature has defined full cash value as being "synonymous" with market value and has defined market value as the "estimate of value that is derived annually by using standard appraisal methods and techniques," A.R.S. § 42–11001(6) (Supp.2006),[5] it has also specified that in applying standard appraisal methods and techniques, "current usage shall be included in the formula for reaching a determination of full cash value." A.R.S. § 42–11054(C)(1) (Supp.2006). The legislature has also directed that "[i]f the methods and techniques prescribe using market data as an indication of market value, the price paid for future anticipated property increments shall be excluded." A.R.S. § 42–11054(D). This language, our supreme court has explained, constitutes "another way of saying that market data valuation [for property tax purposes] must be limited to present usage." *Golder v. Dep't of Revenue,* 123 Ariz. 260, 265, 599 P.2d 216, 221 (1979).[6]

---

4. We cite to the current version of a statute when no material changes have been made to the statute in effect at the time of the incident giving rise to the appeal.

5. Section 42–11001 was renumbered and amended after the valuation date of Miller Park's property. However, the changes are not material to the issues in this case.

6. In *Golder,* the court illustrated the difference between valuing property based on current usage and highest and best use:

   If land is being used for agricultural purposes in the middle of urban growth, the statute in question requires that it be appraised on the basis of current usage. If a market data approach were used to appraise the land, the value of surrounding land would reflect the value for future housing or commercial use.

## B. Admissibility of the Tax Protest Material for Impeachment

¶ 26 Because the property tax system as enacted by the legislature prescribes a method for determining market value that differs from the method for determining market value for purposes of condemnation, valuations prepared for the tax system may not be relevant for impeachment in a condemnation proceeding. Further, other reasons may strip a property owner's tax protest of impeachment value in such a case.

¶ 27 For example, in Arizona, all taxes "shall be uniform upon the same class of property within the territorial limits of the authority levying the tax...." Ariz. Const. art. 9, § 1. Thus, a property owner may contest an assessor's determination of full cash value based on disparate treatment, rather than on any other value basis. *See Aileen H. Char Life Interest v. Maricopa County*, 208 Ariz. 286, 93 P.3d 486 (2004). Further, in a condemnation case, the finder of fact must determine the value of the property as of the date of the taking. An owner's statement in a tax protest regarding the value of the property may be too remote in time from the taking to have probative value. Or, such a statement may have no probative value because of subsequent changes to the property or to conditions affecting it, such as access, zoning, or the availability of utility service. *Cf. Mastick v. State*, 118 Ariz. 366, 368, 576 P.2d 1366, 1368 (App.1978)(testimony of condemnee in condemnation case involving same property nine years earlier admissible as admission of value when physical condition of property had not changed).

¶ 28 Such evidence may, however, depending on the circumstances, have value for impeachment. For example, such evidence could reflect the owner's actual opinion of market value as that term is used in a condemnation action-an opinion based on highest and best use. Or, such evidence might have relevance for impeachment if the owner testi-

fied that characteristics of the property prevented determination of the property's market value. *Cf. State ex rel. Herman v. S. Pac. Co.*, 8 Ariz.App. 238, 241, 445 P.2d 186, 189 (1968)("If the character of the property absolutely precludes any ascertainment of the market value," then "consideration may be given to the value peculiar to the owner, the cost of cure, replacement cost minus depreciation, capitalized cost of inconvenience or any other manner which would be a fair method of compensating a landowner for the damages to his property from eminent domain.").

¶ 29 Further, as SRP points out, in *Jay Six Cattle*, our supreme court recognized that a witness' prior opinion of value regarding condemned property can have probative value for impeachment. There, the superior court refused to allow the state to cross-examine an appraiser retained by the property owner regarding an appraisal of the property that had been prepared by the witness for federal tax purposes less than five months before trial. As instructed by the owner, the appraiser had appraised the property based on its current use as a cattle ranch. At trial, however, the appraiser testified that the property's highest and best use was for investment purposes. Although the supreme court noted the appraisal had "slight probative force" even for impeachment, it concluded "the State should have been permitted the opportunity to examine the report and to cross-examine [the witness] on the basis of its contents, and that the ruling of the trial court, accordingly, constituted error." 88 Ariz. at 106, 353 P.2d at 191.

¶ 30 Thus, although tax protest material may have some probative value for impeachment in a condemnation action, that issue, as with every question regarding relevancy of proposed evidence, is within the trial court's considerable discretion to de-

---

This anticipated or future use may not be used in fixing a value for the land being used as a farm. The difference between market value and the value of the land for agricultural purposes represents that portion of the price which buyers would have to pay for 'future anticipated property value increments.' Since

[the statute] requires that 'current use' be considered in assessing the property, the agricultural user is taxed only to the extent that the land has value for agricultural purposes. The excess is excluded as the statute requires. *Id.* at 265–66, 599 P.2d at 221–22.

cide.[7] "[A]bsent a clear abuse of discretion" by the trial court, we will not "second-guess a trial court's ruling on the admissibility or relevance of evidence." *State v. Spreitz*, 190 Ariz. 129, 146, 945 P.2d 1260, 1277 (1997)(quoting *State v. Rodriguez*, 186 Ariz. 240, 250, 921 P.2d 643, 653 (1996)) (internal quotation marks omitted).

¶ 31 Applying these principles to the circumstances presented in this case, we see no abuse of discretion. Although we agree with SRP that, in ruling on the motion in limine, the superior court relied on a case that no longer has precedential value, the court nevertheless implicitly found the tax protest material was irrelevant, and thus inadmissible.

¶ 32 First, the superior court heard evidence that Miller Park's tax protest material had been prepared for tax, not condemnation, purposes. Before the court ruled on Miller Park's motion, SRP deposed the Deloitte employee who had prepared the tax protest material for submission to the assessor. Referring to the state's statutory tax scheme, the employee testified Deloitte had not attempted to determine the property's "fair market value" but instead had attempted to submit material to the assessor "relevant for the assessor to consider in setting full cash value." As the employee explained: "When we check [on the tax protest form] and say market, it's for the purpose of complying with the statute." The clear import of this testimony—which SRP never controverted—was Deloitte, on Miller Park's behalf, had simply attempted to provide the assessor with information regarding the estimated value of the property based on current, not highest and best use.

¶ 33 Second, Miller Park presented evidence that the tax protest material was irrelevant for impeachment because conditions affecting the property had substantially changed in the 17 months after Deloitte had submitted the tax protest material to the assessor. Buckeye had approved Miller Park's concept plan; water and sewer utility had reached the edge of the property; and residential growth in the surrounding area had mushroomed.

¶ 34 Finally, we disagree with SRP that the supreme court's decision in *Jay Six Cattle* required the court to admit the tax protest material for impeachment. As discussed above, in that condemnation case, the supreme court held the State should have been allowed to cross-examine and impeach the property owner's expert appraiser with the appraisal prepared by that witness for federal tax purposes. But there, the appraiser had prepared the appraisal based on specific instructions from the property owner. Here, in contrast, Miller Park gave no instructions to Deloitte regarding the preparation of the tax protest or how the property should be valued. Indeed, the record reflects Miller Park delegated to Deloitte the responsibility and authority to decide whether to even protest the assessor's valuation. Although Deloitte acted for Miller Park in protesting the valuation, *see* A.R.S. § 32–3653(2) (Supp. 2006), Miller Park's limited role in the tax protest is a factor that may be considered in determining whether the superior court abused its discretion in excluding the tax protest material for purpose of impeachment.

¶ 35 To summarize: a superior court has discretion to determine whether a property owner may be impeached with tax protest material in a condemnation case. Under the circumstances presented in this case, the superior court did not abuse its discretion in barring this impeachment.

### C. The Superior Court Did Not Abuse its Discretion in Denying SRP'S New Trial Motion

¶ 36 SRP next argues the superior court should have granted it a new trial

---

7. We review evidentiary rulings for an abuse of discretion and will generally affirm a superior court's decision to admit or exclude evidence, "absent a clear abuse or legal error and resulting prejudice." *John C. Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, 543, 96 P.3d 530, 541 (App.2004). As noted in the text, *supra* ¶ 20, SRP argues the superior court committed a legal error in relying on *American Support*. We disagree. Depublication of an opinion of this court does not necessarily mean the opinion was legally erroneous, although it does strip the opinion of its precedential force. *See* Michael A. Berch, *Analysis of Arizona's Depublication Rule and Practice*, 32 Ariz. St. L.J. 175, 181, 194 (Spring 2000); *see* ARCAP 28(b).

because the jury's verdict was excessive; that is, the verdict exceeded the range of "taking damages" established by the parties' experts. Accordingly, in SRP's view, the jury should have shoehorned the verdict within the value range established by the retained experts, Martori and Wirth, and disregarded what Pierce had to say about value.

¶ 37 An appellate court reviews the denial of a motion for new trial for an abuse of discretion. *Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App. 1996). Because the trial judge sees the witnesses, hears the testimony, and has a special "perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record," we will reverse only if the court's ruling reflects a manifest abuse of discretion given the record and circumstances of the case. *Reeves v. Markle*, 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978). In reviewing a jury verdict, we view the evidence in a light most favorable to sustaining the verdict, and if any substantial evidence could lead reasonable persons to find the ultimate facts sufficient to support the verdict, we will affirm the judgment. *Styles*, 185 Ariz. at 450, 916 P.2d at 1166.

¶ 38 We find SRP's argument unpersuasive. First, we know of no Arizona authority, and SRP has cited none, that requires the finder of fact in a condemnation case to base the amount of just compensation solely on the range established by opposing experts, to the exclusion of evidence regarding value presented by the property owner. Second, SRP's argument flies in the face of established Arizona law that recognizes that the finder of fact is allowed to consider an owner's opinion regarding the value of his property. A property owner "is always competent to testify as to value.... Any explanation of how he arrived at that value merely goes to the weight of his evidence." *Bd. of Regents of the Univ. and State Colls. of Arizona v. Cannon*, 86 Ariz. 176, 342 P.2d 207 (1959); *accord Atkinson v. Marquart*, 112 Ariz. 304, 307, 541 P.2d 556, 559 (1975); *Acheson v. Shafter*, 107 Ariz. 576, 578, 490 P.2d 832, 834 (1971).

¶ 39 Indeed, in *Town of Paradise Valley v. Laughlin*, 174 Ariz. 484, 851 P.2d 109 (App. 1993), we held that the superior court improperly prohibited the property owner from testifying about the value of his property in a condemnation action. We stated:

[A]n owner of property is always competent to testify as to the value of his property. Any explanation of the basis for his opinion of value goes to the weight of the evidence.

. . . .

[T]he reason that an owner of property is permitted to testify as to its value even if not an expert is because "[a]n owner of property has, by definition, knowledge of the components of value that are useful in ascertaining value, and an owner, no less than an 'expert,' can base his opinion of value on that knowledge."

*Id.* at 486, 851 P.2d at 111 (citations omitted; final brackets in original).

¶ 40 Further, although the jury's verdict fell outside the range of possible values discussed by the experts at trial, the verdict was within the range discussed by Pierce and is not "so exorbitant as to show passion, prejudice, mistake or a complete disregard of the evidence." *Larsen v. Decker*, 196 Ariz. 239, 245, ¶ 14, 995 P.2d 281, 287 (App.2000)(quoting *Valley Nat'l Bank v. Brown*, 110 Ariz. 260, 264, 517 P.2d 1256, 1260 (1974)).

¶ 41 The jury heard ample evidence that in September 2002, Buckeye was a "growth area"; the boundaries of the town were expanding; building permits were increasing, and residential subdivisions were being constructed or were in the planning stages. The jury heard from Kalish and Pierce regarding their own experiences in the Buckeye market, the nature of that market as of the time of the taking, and the amount Kalish had committed to pay for the property based on an arm's-length, bargained-for transaction. The jury also heard testimony from the experts as well as Pierce regarding the appropriate intensity-of-use percentage to apply to the taking, and indeed Pierce's percentage was less than the percentage used by Martori. A jury is not

required to fix a verdict in a condemnation case based on only one witness' testimony. A jury may rely on the testimony of multiple witnesses in determining the appropriate result. In *City of Tucson v. Gastelum*, 25 Ariz.App. 127, 541 P.2d 590 (1975), we stated:

> Where the amount of damages or the value of property is concerned, and where witnesses pick varying sums as a proper estimate of damages or the value of the property, the trial court and the jury are not bound to fix the verdict or judgment at the exact sum testified to by any one of the witnesses, especially when the conclusions are based on many factors. They may instead take part of the necessary factors from the testimony of one witness and part from that of another, and reach a result anywhere between the highest and lowest estimate which may be arrived at by using the various factors appearing in the testimony. Any combination which is reasonable will be sustained by the trial court.

*Id.* at 129, 541 P.2d at 592.

## II. Miller Park's Cross–Appeal

¶ 42 On April 16, 2004, well before trial, Miller Park served SRP with a $2.3 million offer of judgment pursuant to Arizona Rule of Civil Procedure Rule 68. Rule 68(d) provides that if a party rejects an offer of judgment and the offeror then obtains a judgment more favorable than the rejected offer, "the offeree must pay, as a sanction, those reasonable expert witness fees and double the taxable costs of the offeror, as defined in A.R.S. § 12–332, incurred after the making of the offer, and prejudgment interest on unliquidated claims to accrue from the date of the offer." SRP did not respond to the offer and it was "deemed withdrawn" in accordance with the rule.

¶ 43 Following the verdict, Miller Park requested, as sanctions under Rule 68, its reasonable expert witness fees, double its taxable costs incurred after the offer, and prejudgment interest accruing from the date of the offer. SRP opposed Miller Park's request. It asserted Rule 68 sanctions could

not be awarded in condemnation cases because the Rule had been pre-empted by A.R.S. § 12–1128(Supp.2006). That statute grants a court discretion to award costs and jury fees in condemnation cases except in certain circumstances. The superior court denied Miller Park's request. It held that sanctions "under Rule 68 would require a mandatory assessment of sanctions against SRP" and that "a mandatory sanction [was] not appropriate in a condemnation action, even if costs [were] awarded in favor[ ] of the property owner under the Court's discretion." [8]

¶ 44 On cross-appeal, Miller Park argues the superior court should have awarded sanctions under Rule 68. It asserts that when, as here, the property owner in a condemnation case is seeking an award of Rule 68 sanctions, there is no conflict between the rule and the statute. We agree.

¶ 45 Section 12–1128 provides as follows:

A. Costs may be allowed or not, and if allowed may be apportioned between the parties on the same or adverse sides, in the discretion of the court.

B. The jury fee may be assessed or not against the plaintiff, in the discretion of the court. If jury fees are so assessed, they shall be calculated in the same manner and amounts as in other civil actions and the plaintiff shall pay such fee to the clerk of the court for transmittal to the county treasurer who shall dispose such monies in the same manner as the disposition of other jury fees.

C. In an action for condemnation of property by or on behalf of an educational, reformatory or penal institution of the state, if the board or officers having charge of the institution, prior to commencement of the action or proceeding, tender to the owner of the property such sum of money as the board or officers deem the reasonable value of the property, and the owner refuses to accept it and transfer the property, than all costs and expenses of the

---

8. SRP also argued that awarding sanctions under Rule 68 would violate the Arizona constitutional provision requiring the payment of just compensation for private property taken for public use. Ariz. Const. art. 2, § 17. SRP has not raised this argument on appeal, and we do not, therefore, address it.

action or proceeding shall be taxed against the owner unless the sum of money assessed in the judgment as the value of the property and compensation to be paid therefor is greater than the amount so tendered.

¶ 46 As is clear from its plain language, the statute mandates the shifting of costs and expenses between the parties only in those circumstances described in subsection (C). Subsection (A) grants a court discretion to apportion costs in all other circumstances. A court's exercise of discretion under subsection (A) is, however, not without limits.

¶ 47 In *City of Phoenix v. Mori*, 182 Ariz. 612, 898 P.2d 990 (App.1995), this court held that unless a condemnee had obstructed the proceedings or acted in bad faith, or had "refused the condemnor's offer, forced the case unnecessarily to trial, and achieved a verdict no higher than the offer[,]"[9] a court does not have the discretion to award a property owner less than all the taxable costs he had reasonably incurred if he obtained a verdict greater than the offer; nor could the court tax the owner with any portion of the condemnor's costs. *Id.* at 615, 898 P.2d at 993. Although the statute on its face did not "define the limits" of a court's discretion, we explained that our territorial legislature had adopted the statute verbatim from California several years after the California Supreme Court in *San Francisco v. Collins*, 98 Cal. 259, 33 P. 56 (1893), had interpreted that state's constitutional eminent domain provision, which required the payment of just compensation, as limiting the discretion granted to a trial court to allocate costs against condemnees; "[t]o require the [condemnees] ... to pay any portion of their costs *necessarily* incidental to the trial of the issues on their part, or any part of the costs of the [condemnor], would reduce the just compensation awarded by the jury." *Mori*, 182 Ariz. at 614, 898 P.2d at 992 (quoting *Collins*, 33 P. at 57)(emphasis in original). Because there was no inconsistency between *Collins* and this state's policy of just compensation, we found *Collins* to be a "reliable

guidepost" to the meaning of the Arizona statute. *Collins* gave contemporaneous meaning to the California statute our territorial legislature had copied, thus giving rise to a presumption that the legislature had adopted the California statute with the construction placed on it by *Collins*. We also observed that in the years since statehood, the legislature had not found it "desirable" to revise the statute. *Id.* at 614, 898 P.2d at 992.

¶ 48 In *Pima County v. Hogan*, 197 Ariz. 138, 3 P.3d 1058 (App.1999), the court addressed the scope of the court's discretion to assess costs under the statute within the context of a Rule 68 offer of judgment. There, the condemnor served the property owner with a Rule 68 offer of judgment. Following a bench trial, the court awarded the property owner less than the offer of judgment. The condemnor moved for Rule 68 sanctions, specifically expert witness fees and double its taxable costs. The superior court found Rule 68 inapplicable and applied the statute. The court affirmed, after first finding that a conflict existed between the statute and the rule:

> Under § 12–1128(A), a court has broad discretion to award costs among the parties, and therefore may, but need not, award costs to a party who rejected an offer of judgment and did no better after a trial. Rule 68, however, mandates the shifting of costs to the offeror under such circumstances and would require it here. Further, although this case does not involve an institution covered by § 12–1128(C), we agree with the trial court that applying Rule 68 to condemnation cases could yield incongruous results. Given the direct conflict between the statute and rule, it appears they cannot be harmonized. Thus, we must decide which of the two applies to eminent domain proceedings.

*Id.* at 140, 3 P.3d at 1060.

¶ 49 The court then concluded that mandatory cost allocation under Rule 68 in a con-

---

**9.** Unless the requirement is waived by a court, before a condemnor may file a condemnation action, it must deliver to the property owner a written offer to purchase the property and to

"pay just compensation for the property ... and for any compensable damages to the remaining property." A.R.S. § 12–1116(A)(1), (F)(Supp. 2006).

demnation proceeding implicated a substantive, constitutional right—the right to just compensation—not just a procedural matter and therefore the rule was inapplicable. *Id.* at 141, 3 P.3d at 1061 (citing *Rosner v. Denim & Diamonds, Inc.,* 188 Ariz. 431, 937 P.2d 353 (App.1996))(procedural rules cannot abridge substantive rights).

¶ 50 Assuming without deciding *Hogan* was correctly decided, we note it is not controlling here. As Miller Park points out, in *Hogan,* the condemnor was seeking sanctions under the rule; thus, the court was required to decide whether a conflict existed between the statute and the rule, and if it did, whether the rule affected a substantive right. In this case, the rule and the statute were never in conflict. Because Miller Park recovered a verdict in excess of its offer of judgment, it became entitled to an award of costs under the statute, *see Mori,* and an award of costs as sanctions under the rule. Application of the rule in this case does not diminish Miller Park's right to and recovery of just compensation in any way.

¶ 51 Even though the statute and the rule are not in conflict under the circumstances presented here, SRP nevertheless asks us to hold that the rule is simply inapplicable to condemnation cases. It argues that by enacting the statute, and another statute, A.R.S. § 12–1123(B)(Supp.2006), which allows prejudgment interest when there is an order of immediate possession, the legislature intended costs and prejudgment interest to be governed exclusively by these statutes.

¶ 52 We do not agree with SRP's argument. We know of no authority, and SRP has cited none, that holds that a court-promulgated procedural rule becomes inapplicable simply because it and a statute concern the same general subject—in this case, costs and prejudgment interest.[10]

¶ 53 We therefore disagree with the superior court, and hold that under the circumstances of this case, Miller Park was entitled to sanctions under Rule 68. We thus remand to the superior court for entry of an amended judgment awarding Miller Park its reasonable expert witness fees and double its taxable costs awarded to it under A.R.S. § 12–322. However, Miller Park is not entitled to an award of prejudgment interest as a sanction under the rule.

■ ¶ 54 As discussed above, SRP obtained an order of immediate possession. Pursuant to A.R.S. § 12–1123(B), SRP became obligated to pay Miller Park interest on the compensation and damages awarded from the date of the court's order for immediate possession, November 7, 2002.[11] Although one of the sanctions authorized by Rule 68(d) is prejudgment interest, the rule only authorizes such interest on unliquidated claims. By operation of A.R.S. § 12–1123(B), Miller Park became entitled to prejudgment interest on the compensation and damages awarded to it; thus, it did not have any unliquidated claims entitling it to an award of prejudgment interest under Rule 68. *See* State Bar Committee Note to Rule 68 (prejudgment interest is not to be awarded as a sanction under Rule 68 on those portions of the judgment that already include a prejudgment interest award).

## CONCLUSION

¶ 55 For the foregoing reasons, we affirm the judgment entered on the jury's verdict. We reverse the superior court's order denying sanctions under Rule 68, with the exception of prejudgment interest, and remand for

---

**10.** Rule 68 and the statutes cited by SRP serve different purposes. The purpose of Rule 68 is to encourage settlement. *See Hogan,* 197 Ariz. at 139, ¶ 4, 3 P.3d at 1059. Section 12–1128(A) aims to ensure that a condemnee receives "full" just compensation. *Id.* at 139, ¶ 5, 3 P.3d at 1059. Similarly, A.R.S. § 12–1123(B) is designed to ensure a condemnee receives just compensation when the condemnor obtains immediate possession of the property. Interest ensures that the property owner "is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *City of Phoenix v. Campbell,* 151 Ariz. 497, 499, 728 P.2d 1247, 1249 (App.1986)(quoting *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984)).

**11.** Interest under A.R.S. § 12–1123(B) is calculated pursuant to A.R.S. § 48–3628 (Supp.2006). Section 48–3628 mandates a variable interest rate based on changes in the prime rate charged by banks on short-term business loans.

entry of an amended judgment awarding Miller Park its reasonable expert witness fees and doubling the taxable costs awarded to it under A.R.S. § 12–322.

CONCURRING: DANIEL A. BARKER and JON W. THOMPSON, Judges.

