211 P.3d 1176

**Jeff BRETHAUER, a single man,
Plaintiff/Appellant,**

v.

**GENERAL MOTORS CORPORATION,
a Delaware corporation,
Defendant/Appellee.**

No. 1 CA–CV 07–0530.

Court of Appeals of Arizona,
Division 1, Department C.

March 31, 2009.

Law Office of Glynn W. Gilcrease, Jr., PC
By Glynn W. Gilcrease, Jr., Tempe, Wolf

Ardis PC By Patrick M. Ardis (admitted pro hac vice) Sharon Petty (admitted pro hac vice), Memphis, Tennessee, Law Office of Scott E. Boehm, PC By Scott E. Boehm, Phoenix, Attorneys for Plaintiff/Appellant.

Bowman and Brooke LLP By Thomas M. Klein, William F. Auther, Dustin Christner, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

TIMMER, Chief Judge.

¶ 1 During a rainstorm on July 30, 2001, appellant Jeff Brethauer was driving his 1998 Chevrolet pick-up truck southbound on Interstate 17 when the vehicle hydroplaned, swerved off the road, and bounced through the rough terrain of a ditch. The side and rear windows shattered and Brethauer, who asserted he had been wearing his seatbelt before it became unlatched, was ejected out the rear-window opening and suffered a paralyzing injury.

¶ 2 Brethauer later filed this products liability case against appellee General Motors Corporation ("GM") alleging, among other things, that it had defectively designed and manufactured the truck's windows and driver-side seatbelt and was either strictly liable for Brethauer's injuries or liable under a negligence theory. At the trial, a jury found in favor of GM, declining to award any damages to Brethauer. He appeals from the subsequently entered judgment, arguing the court committed reversible error by making certain evidentiary rulings, failing to properly instruct the jury, and precluding him from pursuing a claim for punitive damages. For the reasons that follow, we disagree and therefore affirm.

## DISCUSSION

### I. Evidentiary rulings

#### A. GM's references to Brethauer's use of seatbelt

¶ 3 Brethauer argues the trial court erred in denying his motions for mistrial or other relief because GM engaged in misconduct by violating court orders during its opening statement and during its cross-examination of him regarding seatbelt usage. We review the court's rulings for an abuse of discretion. *Cervantes v. Rijlaarsdam,* 190 Ariz. 396, 398, 949 P.2d 56, 58 (App.1997). We will reverse if GM engaged in misconduct, the misconduct materially affected Brethauer's rights, and it is probable the misconduct "actually influenced the verdict." *Leavy v. Parsell,* 188 Ariz. 69, 72, 932 P.2d 1340, 1343 (1997).

#### 1. Opening statement

¶ 4 Prior to trial, GM moved to preclude testimony from lay witnesses regarding defect and causation issues. Specifically, GM requested the court, among other things, to "prohibit scene witnesses including ... emergency medical personnel from offering opinions or conclusions that the 1998 Chevrolet pickup's seat belt buckles ... were defective and that the alleged defects caused plaintiff's injuries." The court denied GM's motion but noted that, "[e]xcept for under [evidentiary] Rule 801(d)(2),[1] the Court cannot imagine that a scene witness or medical witness should be mentioning the word 'seatbelt.'"

¶ 5 During its opening statement, GM informed the jury that it would view videotaped deposition testimony from Terry Davis, an emergency medical technician who treated Brethauer at the accident scene. Without objection, GM then related Davis' testimony regarding seatbelt usage:

And Mr. Davis is going to say, 'I put in my report that he was not wearing his seat belt.' He's going to say, 'I always ask if they're wearing their seat belt. I've got three places—there's three places to put in the report, either they're not wearing their seat belt, they're wearing it or I don't know.' .... [O]n this one he checked 'not wearing seat belt.' He's going to say, 'I wouldn't check that unless I am sure.' He's also going to say, 'I don't have a specific recollection now five years later,' because he was deposed last week, 'of Mr.

---

1. Arizona Rule of Evidence ("Rule") 801(d)(2) provides that statements by party-opponents are not hearsay when offered against that party.

Brethauer telling me that he was not wearing his seat belt. But I know I talked to him. I know he was alert and oriented. I know I always ask that question. I know I wouldn't put on the report that he wasn't belted unless I had good information that he was not belted.'

The next day, Brethauer filed a Motion for Relief for Violation of Court Order, contending GM violated the court's ruling on the motion in limine by suggesting without foundation that Brethauer admitted he was not belted before the accident. Among other alternatives, he requested a mistrial or an instruction to the jury that Brethauer was wearing his seatbelt immediately prior to the accident. The court denied the motion.

¶ 6 Brethauer argues the trial court erred in denying his motion because GM deliberately violated the court's in limine order by improperly suggesting he was not belted immediately before the accident. He contends this case is governed by the holdings in *Leavy* and *Styles v. Ceranski*, 185 Ariz. 448, 916 P.2d 1164 (App.1996).

¶ 7 In *Leavy*, the defendant in a personal injury lawsuit arising from a two-vehicle accident directly violated court orders by telling the jury in opening statement that an expert witness would say a witness to the accident was highly credible and that emergency room records stated the plaintiff was likely unrestrained at the time of the accident. 188 Ariz. at 71, 932 P.2d at 1342. Later, the defendant again violated the court's order by asking a witness whether plaintiff was wearing his seatbelt immediately after the accident. *Id.* Finally, although the parties were not to litigate' the issue of plaintiff's possible alcohol usage before the accident, the defendant repeatedly referred to the issue during trial. *Id.* The issue of fault was close, but the jury ultimately returned a verdict in favor of the defendant. *Id.* at 71–72, 932 P.2d at 1342–43.

¶ 8 The supreme court held that a new trial was warranted because the defendant's misconduct deprived the plaintiff of a fair trial. *Id.* at 73–74, 932 P.2d at 1344–45. Recognizing the difficulty in determining the probability that misconduct in a close case actually influenced the verdict, the court held

that such probability must be found "when there has been significant misconduct affecting the essential rights of a litigant and when the very nature of the misconduct makes it impossible to determine the extent of prejudice." *Id.* at 73, 932 P.2d at 1344. The court further stated a trial court should find prejudice when, as in the case before it, (1) the misconduct was significant, especially if it involves deliberate violations of rules or court orders, (2) the misconduct was prejudicial in nature because it involved important issues in a close case, and (3) the misconduct was apparently successful. *Id.*

¶ 9 In *Styles*, a medical malpractice lawsuit, the trial court entered a pretrial order limiting each side to one standard-of-care expert witness. 185 Ariz. at 452, 916 P.2d at 1168. During plaintiff's examination of damages witnesses from the Mayo Clinic, however, the court permitted plaintiff to elicit opinions concerning the adequacy of the defendant-physician's prior medical care of plaintiff. *Id.* The court was persuaded that such testimony was appropriate to explain plaintiff's later treatment needs. *Id.* In her closing argument, however, plaintiff relied heavily on the Mayo Clinic experts' opinions regarding the adequacy of defendant's medical care. *Id.*

¶ 10 This court held that a new trial on liability and damages was warranted as plaintiff's argument "unfairly exploited trial court rulings on admission of evidence and boldly disregarded pretrial orders limiting each party to one standard of care witness." *Id.* at 453, 916 P.2d at 1169. Plaintiff's misconduct probably affected the verdict, the court reasoned, because she effectively offered four standard-of-care witnesses while defendant was limited to one such witness. *See id.* Additionally, the jury's decision to award all damages requested by plaintiff increased the likelihood the jury accepted the Mayo Clinic experts' opinions on liability as well as their opinions on damages. *Id.*

¶ 11 We are not persuaded that *Leavy* and *Styles* require a new trial in this case because the record does not reflect that GM engaged in misconduct by its opening statement remarks. The trial court's in limine order did not preclude fact-based testimony

from accident scene witnesses regarding seatbelt usage. The order denied GM's request to preclude opinion testimony from these witnesses that Brethauer's seatbelt was defective or caused him injury. The court's aside that it "could not imagine" that a scene witness should mention "seatbelt" unless admissible pursuant to Rule 801(d)(2) did not serve to prohibit GM from eliciting such evidence; it simply left the issue for future consideration but provided insight to the court's preliminary thoughts on the matter. Moreover, viewed in the context of GM's motion to preclude opinion evidence, we read the court's statement as advising the parties that it would not likely permit a scene witness to offer opinion testimony regarding the seatbelt if a party attempted to elicit such testimony.

¶ 12 In sum, the trial court's in limine order did not preclude GM from eliciting testimony from Davis that he checked a box on his report indicating that Brethauer had not been wearing his seatbelt. Moreover, no other order precluded such testimony.[2] Therefore, unlike the defendant in *Leavy* and the plaintiff in *Styles*, GM did not engage in misconduct by violating a court order, and the trial court did not err by refusing to grant a mistrial or give a curative jury instruction.

## 2. Cross–Examination of Brethauer

■ ¶ 13 One week after trial began, the trial court granted Brethauer's motion to preclude introduction of Davis' report or his testimony regarding Brethauer's seatbelt usage. During its subsequent cross-examination of Brethauer, GM asked, "[n]ow, after the accident, didn't you tell the paramedics at the scene that you were not wearing your seatbelt?" Brethauer objected to the question and moved for a mistrial. After excusing the jury to consider the matter, the trial court overruled the objection and denied the motion. The court ruled that GM's question did not violate the court's prior order because it was not posed to Davis. Additional-

ly, the court concluded the question had a good faith basis in light of Davis' deposition testimony, which, although inadmissible, supported a conclusion that Brethauer had told Davis he had not been wearing a seatbelt. After the jury returned, GM restated its question, and Brethauer denied telling Davis he had not been wearing his seatbelt. GM did not pursue that line of questioning further.

¶ 14 Brethauer argues the court erred in refusing to grant a mistrial because GM purposefully violated the court's order precluding Davis from testifying about Brethauer's seatbelt usage. We disagree. As the trial court pointed out, it only precluded GM from introducing evidence through Davis that Brethauer had not been wearing a seatbelt; it did not preclude GM from eliciting testimony from Brethauer on the subject. Moreover, we further agree with the court that in light of Davis' testimony, GM had a good faith basis to ask the contested question. *See* 1 Joseph M. Livermore, Robert Bartels, and Anne Holt Hameroff, Arizona Practice: Law of Evidence § 611.2 (4th ed.2000) (noting that before asking question that implies that damaging facts exist, questioner must at least have good faith belief in existence of facts). Thus, GM's conduct was not equivalent to the misconduct present in *Leavy* and *Styles*, and the trial court did not err by refusing to grant a mistrial.

## B. Recall evidence

■ ¶ 15 Brethauer argues the trial court erred by granting GM's motion in limine to preclude evidence that GM recalled certain 1994–95 C/K extended cab pick-up trucks ("C/K trucks") because if both the lap belt and shoulder belt energy management loops in those vehicles released at the same time in a frontal collision, the resulting inertial forces and loading of the belts could cause the buckle to unlatch.[3] Although Brethauer drove a different 1998–model pick-up truck, both models used the identical "JDC buckle." According to Brethauer, therefore, the recall

---

**2.** Although Brethauer was aware of Davis' testimony regarding Brethauer's seatbelt usage, he did not move to preclude this testimony prior to trial.

**3.** The record does not reflect the year of the recall.

evidence was relevant to show both that the JDC buckle had a potential to release due to inertial forces and that GM knew about this defect. GM responds, and the trial court agreed, that the recall evidence was irrelevant and would have misled or confused the jury. We review the court's ruling for an abuse of discretion and resulting prejudice. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 506, 917 P.2d 222, 235 (1996).

¶ 16 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ariz. R. Evid. 401. The fact "of consequence" in this case was whether the inertial forces acting on Brethauer's truck as it bounced through rough terrain caused the JDC buckle to unlatch prior to any impact. Indisputably, Brethauer's truck did not have the same fabric belt system that GM replaced in the C/K trucks. Also, Brethauer was not involved in a frontal collision. Brethauer nevertheless contends that the source of inertial forces on the JDC buckles in the C/K trucks was immaterial, and the trial court therefore erred by failing to recognize that the recall evidence tended to show that the JDC buckle released whenever there was inertial forces exerted by any source. But no evidence showed that absent the defective fabric belts in the C/K trucks the JDC buckles could have unlatched in a collision. Thus, we agree with GM and the trial court that the recall of the C/K trucks to replace the belting system in order to avoid unlatching in frontal collisions did not have a tendency to make it more probable that the JDC buckle unlatched during Brethauer's accident.

¶ 17 Even assuming the recall was marginally relevant, the trial court did not err by precluding the evidence pursuant to Rule 403, which authorizes the court to preclude relevant evidence if its probative value is substantially outweighed by, among other things, "the danger of unfair prejudice, confusion of the issues, or misleading the jury." Had the recall evidence been permitted, the jury may have been misled or confused about the import of the evidence due to the design differences between the belting systems in

the C/K trucks and the model driven by Brethauer. If the court then permitted GM to introduce evidence about those differences and the significance of frontal collisions in the recall, an additional danger existed that the jury may have been confused about the issues it needed to decide. For this additional reason, the trial court did not abuse its discretion by granting GM's motion in limine and precluding the recall evidence.

**C. Videotapes**

¶ 18 Brethauer next contends the trial court erred by precluding admission of a three-minute videotaped collage of ten GM-conducted tests on seatbelt systems containing the JDC buckle. Although the court permitted Brethauer to show two crash-test videos to the jury, the court precluded the video collage pursuant to Rule 403 because differences in the ten tests "create a significant possibility of confusion and unfair prejudice to the defense and also the need for what I think would be mini trials with respect to what's similar and what's different." We review the court's ruling for an abuse of discretion and resulting prejudice. *See Gemstar Ltd.*, 185 Ariz. at 506–07, 917 P.2d at 235–36.

¶ 19 Brethauer first contends the court erred in its ruling because the ten tests were different from the two tests shown to the jury, and Brethauer was entitled to have the jury see the variety of situations under which inertial forces caused the buckle to unlatch. We reject this contention because it is falsely grounded on the notion that the court precluded the evidence as cumulative. As noted previously, the court precluded the evidence because the differences in the tests created a significant danger of confusion for the jury, unfair prejudice to GM, and a waste of time.

¶ 20 Brethauer next argues the court erred because preclusion of the collage led the jury falsely to believe that inertial release of the JDC buckle was an infrequent event and only occurred in limited circumstances. The ten excluded tests showed buckle releases under a variety of circumstances. Seven tests involved the recalled lap and shoulder belts, *see supra* ¶¶ 15–17, one involved torn belt webbing at the latch plate of a buckle proto-

type due to a sewing problem, one involved a buckle that unlatched when a test dummy struck the release button after impact, and one involved a buckle release that occurred on rebound of the dummy after a crash. We need not address the parties' arguments concerning the probative value of this evidence. Even assuming the relevancy of these tests, all involved variables not presented by the circumstances of Brethauer's accident. Thus, as the trial court stated, GM would have been entitled to present evidence of these differences, which may have confused the jury, unfairly prejudiced GM, and unnecessarily prolonged the trial. And, as the court additionally noted, it had already permitted the introduction of two crash-test videotapes. For these reasons, we cannot say the court erred by concluding that any probative value of the collage was substantially outweighed by the dangers of confusion and unfair prejudice and the possibility of wasting trial time. *See* Rule 403.

¶ 21 Brethauer finally argues the court erred by precluding the collage because his expert witness relied on the ten tests in forming his opinion. We disagree. Mere reliance by an expert on data does not automatically make that data admissible at trial. *See Lynn v. Helitec Corp.*, 144 Ariz. 564, 568, 698 P.2d 1283, 1287 (App.1984) (recognizing that expert can rely on inadmissible facts and data in constructing opinion). Moreover, we are not aware of any authority preventing the court from precluding such evidence pursuant to Rule 403, as it did in this case. *See Logerquist v. McVey*, 196 Ariz. 470, 489, ¶ 58, 1 P.3d 113, 132 (2000) (recognizing that court can invoke Rule 403 to preclude relevant expert opinion testimony). We do not perceive error.

## II. Jury instructions

¶ 22 A manufacturer is strictly liable for injuries caused by use of a product in a defective condition and unreasonably dangerous. *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 244, 709 P.2d 876, 878 (1985); *Golonka*

*v. Gen. Motors Corp.*, 204 Ariz. 575, 581, ¶ 13, 65 P.3d 956, 962 (App.2003). Two models of inquiry are available to decide whether a product was in such a condition:

> Under the "consumer expectation test," the fact-finder determines whether the product "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner." If so, the product was in a defective condition and unreasonably dangerous. The "risk/benefit analysis" asks the fact-finder to decide, in light of relevant factors, whether "the benefits of [a] challenged design ... outweigh the risk of danger inherent in [the] design." If not, the design was defective and unreasonably dangerous.

*Golonka*, 204 Ariz. at 581, ¶ 14, 65 P.3d at 962 (alteration in original) (citations omitted).

¶ 23 In the present case, the trial court instructed the jury on the consumer expectation test for Brethauer's manufacturing defect claim, but it instructed the jury only on a form of the risk/benefit analysis for his design defect claim.[4] Brethauer argues the trial court erred by refusing to give the consumer-expectation-test instruction for use in evaluating his claim that GM's design of the truck's seatbelt was defective.

¶ 24 "A trial court must give a requested [jury] instruction if: (1) the evidence presented supports the instruction, (2) the instruction is proper under the law, and (3) the instruction pertains to an important issue, and the gist of the instruction is not given in any other instructions." *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 144 Ariz. 6, 10, 695 P.2d 255, 259 (1985). We review the trial court's refusal to give a requested instruction for an abuse of discretion, but we will not reverse on this basis absent resulting prejudice. *State v. Ruggiero*, 211 Ariz. 262, 264, ¶ 6, 120 P.3d 690, 692 (App.2005).

---

4. In accordance with Revised Arizona Jury Instructions Product Liability 3, the court instructed the jury that "[t]he product is defective and unreasonably dangerous because of a design defect if the harmful characteristics or conse-

quences of its design outweigh the benefits of the design." Although this instruction did not precisely track the risk/benefit analysis as described in prior cases, neither party contends the instruction meaningfully varied the standard.

¶ 25 Our supreme court has stated that "while the consumer expectation test may sometimes work well in design defect cases, it provides no resolution for those cases in which 'the consumer would not know what to expect, because he would have no idea how safe the product could be made.'" *Dart*, 147 Ariz. at 244, 709 P.2d at 878 (citing John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 829 (1973)); *see also Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 242, 745 P.2d 986, 989 (App.1987) (holding the consumer expectation test does not apply "when the consumer would have no expectation because he would have no knowledge of how safe the product could be made"). In close cases, the court may deem it necessary to instruct the jury on both the consumer expectation test and the risk/benefit analysis. *Dart*, 147 Ariz. at 248, 709 P.2d at 882; *see also Golonka*, 204 Ariz. at 581, ¶ 15, 65 P.3d at 962 (stating that "when application of the consumer expectation test is unfeasible or uncertain in design defect cases, courts additionally or alternatively employ the risk/benefit analysis to determine whether a design is defective and unreasonably dangerous").

¶ 26 Brethauer argues a consumer expectation instruction was warranted in this case because ordinary consumers have an expectation about the safety performance of seatbelts. Specifically, he contends that because motorized vehicles are an integral part of our lives and drivers are bombarded with messages touting the importance of "buckling up for safety," consumers have developed an expectation that a seatbelt will remain latched during an accident. GM responds that although ordinary consumers expect vehicles to have seatbelts, they have no idea how well the seatbelts should perform under the circumstances of a particular accident or how seatbelts are designed and regulated in light of specific engineering considerations. Resolution of this dispute requires us to decide whether an ordinary consumer's expectation concerning a seatbelt's function equates to an expectation concerning the seatbelt's safety performance.

¶ 27 As indicated above, *Dart* tells us the consumer expectation test is inapplicable in situations when a consumer cannot form an expectation as to how safely the product could be made. 147 Ariz. at 244, 709 P.2d at 878. We do not view this statement as meaning an ordinary consumer must have an expectation about the specifics of design before the consumer expectation test can be employed. Rather, the consumer's expectation referred to in *Dart* necessarily is an expectation of how safely the product could be made to perform—the touchstone of the consumer expectation test. *See Golonka*, 204 Ariz. at 581, ¶ 14, 65 P.3d at 962 (stating that "[u]nder the 'consumer expectation test,' the fact-finder determines whether the product 'failed to *perform as safely* as an ordinary consumer would expect when used in an intended or reasonable manner.'" (citation omitted) (emphasis added)). If the consumer expectation test was applicable only when a consumer could form an expectation as to the product's actual design, the test would almost never apply because the average consumer is typically not familiar with any product's intricate design details. On the other hand, consumers do form expectations as to how safely products they purchase will *perform*. Therefore, an instruction on the consumer expectation test is warranted in cases when the ordinary consumer, through use of a product, has developed an expectation regarding the performance safety of the product. *See Garza v. Asbestos Corp., Ltd.*, 161 Cal. App.4th 651, 74 Cal.Rptr.3d 359, 366 (2008) (holding that "[t]he consumer expectations [sic] test asks if the reasonable minimum safety expectations of the product's ordinary consumers were violated") (first alteration in original) (citations omitted); *see also Adames v. Sheahan*, 378 Ill.App.3d 502, 316 Ill.Dec. 823, 880 N.E.2d 559, 579 (2007) (holding that a plaintiff can show a product's defectiveness using the consumer expectation test "by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner") (citations omitted).

¶ 28 We are persuaded that consumers have expectations about how safely seatbelts will perform. As Brethauer asserts, our society is educated from a young age

about the importance of "buckling up" and using seatbelts while driving vehicles. Federal law requires manufacturers to install seatbelts in most passenger vehicles, 49 C.F.R. § 571.208 (2009),[5] and since 1996, Arizona has required front-seat passengers and passengers younger than sixteen years in most vehicles to wear seatbelts when the vehicle is in motion. Ariz.Rev.Stat. ("A.R.S.") § 28–909 (2004) and historical note. In short, most consumers use seatbelts daily and are familiar with their single, safety-related function: keeping belted passengers restrained within a vehicle. *See* 49 C.F.R. § 571.208(S1) (stating seatbelt and other vehicle performance standards provided for protection of vehicle occupants in crashes). For this reason, the trial court erred by failing to instruct the jury on the consumer expectation test.[6] Other courts that have addressed this issue have reached the same conclusion. *See Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn.2001) (holding that seatbelts "generally are familiar products for which consumers' expectations of safety have had an opportunity to develop, and the function which they were designed to perform is well known"); *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1221 (Alaska 1998) (concluding that "[a] seat belt is a familiar product whose basic function is well understood by the general population"); *but see Fremaint v. Ford Motor Co.*, 258 F.Supp.2d 24, 30 (D.Puerto Rico 2003) (deciding that "ordinary consumers are ill-equipped to decide what minimum safety to expect from seatbelts once a vehicle is involved in an accident. . . .").

■ ¶ 29 Although the trial court erred in failing to give the consumer-expectation-test instruction, in order to secure a new trial Brethauer must show the error prejudiced his substantial rights. *Ruggiero*, 211 Ariz. at 264, ¶ 6, 120 P.3d at 692; *Gemstar Ltd.*, 185 Ariz. at 504, 917 P.2d at 233. Our supreme court has held that " '[t]he prejudicial nature of the error will not be presumed but must affirmatively appear from the record.' " *Gemstar Ltd.*, 185 Ariz. at 504, 917 P.2d at 233 (quoting *Walters v. First Fed. Sav. & Loan Ass'n*, 131 Ariz. 321, 326, 641 P.2d 235, 240 (1982)) (alteration in original).

¶ 30 Brethauer argues he suffered prejudice from the lack of a consumer-expectation-test instruction because the omitted instruction "goes to the heart of the case." *See Dart*, 147 Ariz. at 250, 709 P.2d at 884. *Dart* holds, however, that an error in giving jury instructions is reversible only if it also misapplies the law. *Id.* In *Dart*, the trial court misapplied the law by issuing a negligence instruction when a strict liability instruction was required. *Id.* at 249–50, 709 P.2d at 883–84. Our supreme court held that the trial court "committed prejudicial error because the legal theories properly advanced by plaintiff were misapplied and mischaracterized." *Id.* at 250, 709 P.2d at 884.

¶ 31 This case is distinguishable from *Dart* because the trial court here did not similarly misapply the law. The court instructed the jury to apply the risk/benefit analysis (a strict liability test) instead of the consumer expectation test (a different strict liability test) to determine whether GM's seatbelt buckle was defectively designed. Thus, unlike the plaintiff in *Dart*, Brethauer did receive a strict liability instruction via the risk/benefit analysis instruction. The trial court here did not, as did the court in *Dart*, misapply or mischaracterize the law by giving a negligence instruction instead of a strict liability instruction; it simply issued an instruction on a different strict liability test than Brethauer requested. Unlike the plaintiff in *Dart*, Brethauer was not deprived of

**5.** We cite the current versions of the applicable statutes cited herein because no revisions material to this decision have occurred since commencement of this lawsuit.

**6.** GM argues that applying the consumer expectation test in seatbelt design defect cases would impose absolute liability on the manufacturer. We disagree. Regardless of what jury instruction is given or what test is used, a defendant is always free to assert the "state of the art" de-

fense, thus eliminating any potential for absolute liability. A.R.S. § 12–683(1) (2003) (stating that a defendant in a product liability action is not liable when "[t]he defect in the product is alleged to result from inadequate design or fabrication, and if the plans or designs for the product or the methods and techniques of manufacturing, inspecting, testing and labeling the product conformed with the state of the art at the time the product was first sold by the defendant").

 

an opportunity to argue strict liability. Indeed, Brethauer was free to argue consumers' expectations and, in fact, he effectively did so.[7] *See Dart*, 147 Ariz. at 245–46, 709 P.2d at 879–80 (citing *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 267, 550 P.2d 1065, 1068 (1976)) (stating as relevant factor to consider in risk/benefit analysis "[the] common knowledge and normal public expectation of the danger (particularly for established products)").

¶ 32 Because the trial court instructed the jury on the risk/benefit analysis and the jury reached a verdict for GM, it is reasonable to conclude the jury found either that Brethauer was not wearing his seatbelt[8] or that the harmful characteristics or consequences of its design did not outweigh the benefits of the design. *See supra* n. 4. Evaluating the verdict in that light, it is unlikely the jury would have arrived at a different conclusion had it been instructed on the consumer expectation test. Assuming the jury found that Brethauer was wearing his seatbelt, we cannot conceive it would have simultaneously rejected the notion that the harmful characteristics or consequences of the seatbelt design outweighed the benefits of the design (risk/benefit analysis) but found GM strictly liable because the seatbelt failed to perform as safely as an ordinary consumer would have expected (consumer expectation test). For this reason, we decide that although the trial court erred by failing to instruct the jury on the consumer expectation test, because the record does not affirmatively demonstrate that the error prejudiced Brethauer, a new trial is not in order.

### III. Punitive damages

¶ 33 In light of the jury's failure to award compensatory damages to Brethauer, cou-

---

7. Brethauer's attorney made the following statements during his closing argument: "A seat belt isn't reasonably safe if it fails when you need it. What is the job of a seat belt? Isn't it to keep you in the vehicle, to stay buckled? How can it be the state of the art if it fails in an accident? The type of JDC buckle that General Motors used in this car failed in the real world."

8. Evidence at trial supported a conclusion that Brethauer was not buckled at the time of the accident. For example, his truck's sensing and

---

pled with our decision that he is not entitled to a new trial, Brethauer's arguments concerning punitive damages are moot, and we need not address them.

### CONCLUSION

¶ 34 For the foregoing reasons, we affirm.

CONCURRING: PATRICK IRVINE, Vice Chief Judge, and MICHAEL J. BROWN, Judge.

---

diagnostic module recorded that the driver's seatbelt was not buckled when the truck had its greatest change of velocity during the accident. Richard Bass, a GM field performance assessment engineer, testified that this information was consistent with a finding that Brethauer was not buckled 40 milliseconds prior to the recorded change in velocity. Indeed, Brethauer's counsel acknowledged during oral argument on appeal that the jury likely concluded Brethauer was not wearing his seatbelt.