NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

SHAWN MAYWALD, an individual,
and TANYA L. MAYWALD, an individual, *Plaintiffs/Appellants*,

*v.*

TOYOTA MOTOR CORPORATION, a Japanese corporation; TOYOTA
MOTOR NORTH AMERICA, INC., a California corporation; OVERTYME,
INC., an Arizona corporation, *Defendants/Appellees*.

No. 1 CA-CV 23-0723
FILED 12-19-2024

---

Appeal from the Superior Court in Navajo County
No. S0900CV202100003
The Honorable Melinda K. Hardy, Judge

**VACATED AND REMANDED**

---

COUNSEL

Shumway Law, PLLC, Phoenix
By G. Lynn Shumway
*Counsel for Plaintiffs/Appellants*

Ghelfi Law Group, Phoenix
By Brent Ghelfi
*Counsel for Plaintiffs/Appellants*

Bowman and Brooke LLP, Phoenix
By James W. Halbrooks Jr., William F. Auther,
Amanda E. Heitz, Alexander J. Egbert
*Counsel for Defendants/Appellees*

---

## MEMORANDUM DECISION

Presiding Judge Brian Y. Furuya delivered the decision of the Court, in which Judge Andrew M. Jacobs joined. Judge James B. Morse Jr. concurs in the result.

---

**F U R U Y A**, Judge:

**¶1**       Shawn and Tanya-Lynn Maywald appeal the superior court's grant of summary judgment for Toyota Motor Corporation, Toyota Motor North America, Inc., and Overtyme, Inc. (collectively "Toyota"). For the following reasons, we vacate the judgment and remand for further proceedings.

### FACTS AND PROCEDURAL HISTORY

**¶2**       This is a products liability dispute concerning Toyota's 2019 4Runner, which is not equipped with Lane Departure Warning technology ("LDW"). LDW is a feature that, when activated and under certain driving conditions, can provide an audible and visual alert to a driver who has inadvertently left the current lane of travel. The 4Runner did not include LDW in 2017, 2018, and 2019 models. Toyota incorporated the technology into the 2020 model after a redesign.

**¶3**       In December 2019, the Maywalds were travelling southbound on State Route 77 in Navajo county. At that time, Emilio Tsosie was driving a 2019 4Runner northbound on that same road. Tsosie fell asleep, drifted from his lane, and collided with the Maywalds' vehicle. Shawn suffered serious injuries in this collision.

**¶4**       The Maywalds filed a complaint against Toyota, alleging claims for strict products liability, negligence, and loss of consortium. After discovery, Toyota moved for summary judgment, arguing the Maywalds could not establish the 2019 4Runner was defective and unreasonably dangerous, such that its design was a cause of the collision. The Maywalds filed two cross-motions for partial summary judgment concerning Arizona's risk/benefit analysis and Toyota's comparative fault defense. The Maywalds also filed a motion to exclude Toyota's expert witness testimony regarding design defects. After argument, the superior court

granted Toyota's motion, denied the Maywalds' motions, and entered a final judgment.

¶5 We have jurisdiction over the Maywalds' timely appeal under Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") §§ 12-120.01(A)(1), -2101(A)(1).

## DISCUSSION

¶6 We review the court's ruling on a motion for summary judgment de novo, viewing the facts and reasonable inferences in the light most favorable to the non-moving party; here, the Maywalds. *Rosenberg v. Sanders*, 256 Ariz. 328, 333 ¶ 24 (2023). The court must "grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). Further, a party is entitled to a grant of summary judgment if the facts produced in support of the non-movant's claim "have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim." *Rosenberg*, 256 Ariz. at 332–33 ¶ 23 (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990)). But summary judgment is not appropriate as a "substitute for jury trials simply because the trial judge may believe the moving party *will* probably win the jury's verdict, nor even when the trial judge believes the moving party *should* win the jury's verdict." *Orme Sch.*, 166 Ariz. at 310.

## I.     Genuine Disputes as to Material Facts Exist as to the Maywalds' Strict Products Liability Claim.

¶7 To establish a prima facie case of strict products liability, plaintiffs must present evidence that when a product left a defendant's control: (1) "the product was in a defective condition that made it unreasonably dangerous," and (2) "the defective condition proximately caused the plaintiff's injuries." *Dillon v. Zeneca Corp.*, 202 Ariz. 167, 172 ¶ 14 (App. 2002).

### A.     Whether the Absence of LDW Made the 2019 4Runner Unreasonably Dangerous is a Question of Fact.

¶8 "Under strict liability principles, a manufacturer is required to adopt . . . safety devices which would prevent the product from becoming unreasonably dangerous." *Rogers v. Unimac Co.*, 115 Ariz. 304, 307 (1977). "A defectively designed product is one that is made as the manufacturer intended it to be but that is unreasonably dangerous."

*Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 242 (App. 1987). Arizona courts have developed two tests to determine whether a defective product was unreasonably dangerous: the consumer expectations test and risk/benefit analysis. *Golonka v. Gen. Motors Corp.*, 204 Ariz. 575, 581 ¶ 13 (App. 2003). Which test to apply depends upon the facts and circumstances specific to each case. *See Brethauer v. Gen. Motors Corp.*, 221 Ariz. 192, 199 ¶ 25 (App. 2009).

### 1. The consumer expectation test does not apply to this case.

**¶9** "Under the consumer expectation test, the fact-finder determines whether the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner." *Golonka*, 204 Ariz. at 581 ¶ 14 (quotation omitted). "If so, the product was in a defective condition and unreasonably dangerous." *Id.* In design defect cases, "the consumer's expectation . . . is an expectation of how safely the product could be made to perform—the touchstone of the consumer expectation test." *Brethauer*, 221 Ariz. at 199 ¶ 27. For the consumer's expectation test to apply, an ordinary consumer does not need to know the "specifics of design." *Id.* But "while the consumer expectation test may sometimes work well in design defect cases, it provides no resolution for those cases in which the consumer would not know what to expect, because he would have no idea how safe the product could be made." *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 244 (1985) (internal quotation omitted). Thus, the test applies only "when the ordinary consumer, through use of a product, has developed an expectation regarding the performance safety of the product." *Brethauer*, 221 Ariz. at 199 ¶ 27.

**¶10** Here, we are unpersuaded that LDW technology is so familiar and ubiquitous to the driving public that the ordinary driver would expect its inclusion as necessary to the safe performance of the vehicle. The Maywalds point to evidence they submitted that LDW has been available in other Toyota models since 2002. And they submitted further evidence concerning studies about LDW's efficacy in preventing accidents due to unintentional lane departures, and its wide availability in 2019, including on most other Toyota model lines. But even viewing it in the light most favorable to the Maywalds, this evidence cannot establish the kind of wide public acceptance and awareness of LDW required to impute a general expectation of its inclusion in vehicles, such that Toyota's failure to include LDW in the design of the 2019 4Runner made it unreasonably dangerous. *See Golonka*, 204 Ariz. at 581 ¶ 14. Thus, we must turn to risk/benefit analysis.

### 2.    *Risk/benefit analysis applies to this case.*

**¶11**       Under risk/benefit analysis, the fact-finder is asked to determine "in light of relevant factors, whether the benefits of a challenged design . . . outweigh the risk of danger inherent in the design." *Id.* (cleaned up). In so doing, they must consider several factors to determine whether a defect is unreasonably dangerous: "(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." *Dart*, 147 Ariz. at 245–46.

**¶12**       In this case, the Maywalds presented evidence that unintended lane departures are a leading, and therefore common, cause of vehicle accidents. The Maywalds' evidence also discussed the severity of injuries resulting from unintended lane departures. Both parties recognize the purpose of LDW is to alert inattentive drivers in the event of such unintended lane departures. And while Toyota disputes its effectiveness in this case, no party disputes LDW's general effectiveness or that the technology can reduce collisions due to unintended lane departures. Toyota did not argue the 2019 4Runner was designed with any features that otherwise fulfill the function of LDW. Importantly, it does not dispute installation of LDW in the 2019 4Runner was feasible without seriously impairing the usefulness of the product or making it unduly expensive.

**¶13**       Citing *Vineyard v. Empire Mach. Co.*, 119 Ariz. 502 (App. 1978) and *Chavarria v. Ford Motor Co.*, 124 Ariz. 158 (App. 1979), Toyota asserts the Maywalds' claims cannot survive summary judgment because they failed, as a preliminary matter, to show any separate underlying defect in the 2019 4Runner—for example, a propensity to move out of its lane. And without first showing such a defect, the absence of LDW cannot be a dangerous condition. Both cases are inapposite.

**¶14**       In *Vineyard*, a plaintiff sued a tractor manufacturer for strict products liability after the manufacturer's tractor rolled over, causing the plaintiff serious injuries. *Vineyard*, 199 Ariz. at 503–04. The plaintiff pointed to the lack of roll-over bars to protect operators in the event of roll-overs as a defect making the tractor unreasonably dangerous. *Vineyard*, 199 Ariz. at 504. The trial court entered summary judgment against the plaintiff because

the lack of roll-over bars was open and obvious. *Id.* In affirming the judgment, the *Vineyard* court based its decision on the obviousness inherent in the lack of roll-over protections and the plaintiff's prior experiences with instability during his earlier operation of the tractor. *See id.* at 505–06. *Vineyard* did not decide the issue of whether failure to design a product to include safety precautions could qualify as a defect without first establishing a separate defect in the product. Indeed, the *Vineyard* court expressly recognized, albeit via waiver, that the "lack of roll-over protection is a defect" and proceeded to analyze whether that defect was unreasonably dangerous. *Id.* Rather, the case turned on the definition of "unreasonably dangerous" expressed in Comment (i) to the 1965 version of Section 402A of the Restatement (Second) of Torts. *Id.* at 505. But this is merely an expression of the consumer expectations test, not — as Toyota suggests — the imposition of a requirement to separately establish a defect in the product as a condition precedent to examining the product's design. And as explained above, *see supra* ¶¶ 9–10, the consumer expectations test is unsuitable to this case.

¶15        Moreover, we are skeptical of *Vineyard*'s continued utility after our supreme court clarified Arizona's strict products liability law in the design defect context in *Dart*. *Compare Vineyard*, 199 Ariz. 504–05 (assuming Arizona rejected risk/benefit analysis as set forth in *Barker v. Lull Engineering Co., Inc.*, 573 P.2d 443 (Cal. 1978)), *with Dart*, 147 Ariz. at 245 (approving risk/benefit analysis as expressed in *Barker* as an alternative strict products liability test and noting *Barker*'s "analysis is a logical refinement of [the Arizona Supreme Court's] previous reasoning in [*Byrns v. Riddell*, 113 Ariz. 264 (1976)].").

¶16        Thus, Toyota's reliance on *Vineyard* is misplaced. That case does not establish a separate requirement to find a defect as a necessary predicate to applying risk/benefit analysis. Further, it expresses an outdated understanding of strict products liability law in the design defect context that was superseded by *Dart*. And because *Chavarria* relies on *Vineyard* and is of like vintage, it is likewise unhelpful. *See Chavarria*, 124 Ariz. at 159 (analyzing case under *Vineyard*, but distinguishing it on its unique facts). Instead, risk/benefit analysis as set forth in *Dart* and its progeny controls.

¶17        Toyota further argues risk/benefit analysis should be applied to the 2019 4Runner as designed — i.e., without LDW — because LDW "could be incorporated into the 2020 4Runner only after the vehicle was completely redesigned." There are two problems with this position.

**¶18** First, it is inconsistent with strict products liability law in design cases, which requires considering the possibility of designs different from the one the manufacturer intended and adopted. *See Gomulka*, 155 Ariz. at 242 ("A defectively designed product is one that is made *as the manufacturer intended it to be* but that is unreasonably dangerous.") (emphasis added).

**¶19** Second, it is belied by Toyota's own statements. Toyota admitted during deposition testimony that it was technically feasible to have installed LDW on the 4Runner by at least 2018, the model year before the vehicle involved in the collision. It testified:

> Q. Was it technologically feasible to put a [LDW] system into the 4Runner in model year 2018 if it was started on March 30th, 2015, to work toward that?
>
> A. Technically feasible. There would have to be many changes, but it's technically feasible that the 4Runner could be chosen to be one of the vehicles to receive it at a particular timing.

Toyota did not explain why it did not choose the 4Runner for installation of LDW before 2020 or provide any evidence that addressed the risk/benefit analysis factors.

**¶20** Further, the superior court, in support of its ruling, stated that "LDW/LDA technology became an option or feature on the Toyota 2019 4Runner after 3600 hours of redesign." But no evidence in the record supports this finding. Rather, the statement appears to originate from oral argument on the summary judgment, when Toyota's counsel stated, "it took 36,000 man hours to redesign the 4Runner to put a lane departure warning system into it." And even if Toyota had presented proof of the number of hours required to install LDW, that would simply be more evidence for a jury to consider in deciding whether the 2019 4Runner's design was unreasonably dangerous. *See Dart*, 147 Ariz. at 246.

**¶21** Though Toyota may view it as inadequate, the Maywalds' evidence and the reasonable inferences from it raise genuine disputes of material fact as to whether the benefits of including LDW technology in the 4Runner's design outweigh the risks inherent in omitting it. These disputes of material fact make summary judgment inappropriate.

## II. Genuine Disputes as to Material Facts Exist Regarding the Maywalds' Negligence Claim.

**¶22**         In a negligent design case, a manufacturer is liable if it "acted unreasonably at the time of design or manufacture in light of the foreseeable risk of injury from use of the product." *Golonka*, 204 Ariz. at 581 ¶ 16. In determining the reasonableness of the manufacturer's actions, "the fact-finder considers the same risk/benefit analysis factors used to determine strict liability." *Id.*; *see Dart*, 147 Ariz. at 246. The main focus in negligent design cases is "whether the manufacturer's conduct was unreasonable in light of the foreseeable risk of injury." *Id.* at 582 ¶ 17; *see Gomulka*, 155 Ariz. at 242 ("A negligent design case focuses on whether the defendant's conduct was reasonable in view of a foreseeable risk at the time of design of the product.").

**¶23**         Here, the Maywalds presented sufficient evidence to raise disputes of material fact as to whether Toyota was negligent in not installing LDW into the 2019 4Runner. Toyota first introduced LDW in 2002 to help its vehicle owners reduce the risk of unintended lane departures. Toyota testified in deposition that it made LDW standard for the Toyota Safety Sense Package because it recognized the benefits of LDW. But, it did not install LDW in the 2019 4Runner despite its technical feasibility. Because Toyota did not present any evidence as to why it did not install LDW in the 2019 4Runner, the Maywalds have again shown a dispute of material facts that a jury must resolve as to whether Toyota acted unreasonably at the time it designed the 2019 4Runner.

## III. Whether the Absence of LDW was a Proximate Cause of the Collision is a Question of Fact.

**¶24**         Causation is a necessary element of both strict products liability claims, *see Dillon*, 202 Ariz. at 172 ¶ 14, and negligence claims, *Gipson v. Kasey*, 214 Ariz. 141, 143 ¶ 9 (2007). Proximate cause is "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Saucedo ex rel. Sinaloa v. Salvation Army*, 200 Ariz. 179, 183 ¶ 15 (App. 2001). Determining proximate cause ordinarily is a question of fact for a jury. *Torres v. Jai Dining Servs. (Phoenix) Inc.*, 252 Ariz. 28, 30 ¶ 11 (2021). To survive summary judgment, a plaintiff "need only present probable facts from which the causal relationship reasonably may be inferred." *Braillard v. Maricopa Cnty.*, 224 Ariz. 481, 496–97 ¶ 50 (App. 2010) (quoting *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990). "The defendant's act or omission need not be a 'large' or 'abundant' cause

of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Id.* (quotation omitted).

**¶25**　　　Here, the Maywalds introduced sufficient causation evidence to raise disputes of material fact. Tsosie, the driver of the 2019 4Runner, provided an affidavit stating he would have turned LDW on based on his prior experience with warning systems. The Maywalds' expert stated in an affidavit that LDW would have warned Tsosie when he started to deviate from his lane, given the collision happened on straight, well-marked roads in daylight under good driving conditions. He testified LDW would have given Tsosie additional time to avoid the collision because Tsosie had initiated steering prior to the accident. The expert further opined that the presence of active LDW in the 2019 4Runner at the time of the collision would more likely than not have prevented this accident.

**¶26**　　　Toyota counters that this evidence constitutes unsupported speculation that cannot establish causation. We disagree. The Maywalds' causation evidence was sufficiently specific and definite to prompt Toyota to proffer relevant contrary evidence of its own. For example, Toyota's own expert stated that LDW's efficiency may be affected by several factors, such as road and lighting conditions. Further, another of Toyota's experts criticized the Maywalds' expert in another affidavit, stating that no studies evaluated the perception and reaction time in sleeping drivers to gauge the efficacy of alert systems. Though Toyota may disbelieve Tsosie's and the Maywalds' expert's statements because, as it argues, they lack sufficient support, such concerns go to the question of their weight. But the conflicting evidence cries out for resolution by a jury, rendering summary judgment as to causation inappropriate.

**¶27**　　　Therefore, we hold that disputed issues of material fact exist as to whether lack of LDW in the 2019 4Runner was a proximate cause of the injuries at issue.

### IV.　We Do Not Address Denial of the Maywalds' Motion for Summary Judgment and Discovery Motions.

**¶28**　　　The Maywalds argue the court erred in denying their two motions for summary judgment and motion to exclude Toyota's expert. The court dismissed these motions as moot without reaching their merits. Denial of a motion for summary judgment is not itself appealable. *Manicom v. CitiMortgage, Inc.*, 236 Ariz. 153, 162 ¶ 37 (App. 2014), *as corrected* (Nov.

19, 2014). Moreover, because the court did not address the merits of the motions, we decline to address them in the first instance on appeal. *Id.*

**CONCLUSION**

**¶29** For the reasons explained, we vacate the superior court's grant of summary judgment. Because the Maywalds' loss of consortium claim was resolved summarily in tandem with their substantive claims for strict products liability and negligent design, which we reinstate today, we likewise vacate summary judgment as to the loss of consortium claim. *See Martin v. Staheli*, 248 Ariz. 87, 92 ¶ 16 (App. 2019) (loss of consortium claim depends on the underlying tortious action that caused the injury).

**¶30** The case is remanded for further proceedings.

**M O R S E,** Judge, concurring in the result:

**¶31** I concur in the result because the majority correctly applies *Golonka*, 204 Ariz. at 581 ¶ 13, and neither party asks us to overrule that decision. I write separately to express concern over the potential liabilities associated with emerging-autonomous technologies and Advanced Driver Assistance Systems ("ADAS"), of which LDW is a subset. While the majority applies a risk/benefit analysis, the pace of innovation in car-safety features introduces novel and unforeseeable challenges for manufacturers and litigants. As ADAS features become more prevalent, the omission of such technologies may be leveraged in litigation as evidence of a design defect, particularly in the absence of clear legislative and regulatory guidance. This area remains largely unlitigated, but as the legal landscape and ADAS develop, manufacturers could find themselves held accountable for design decisions based on evolving-industry standards, even when those omissions were previously considered reasonable.

**¶32** For example, in *Mikolajczyk v. Ford Motor Co.*, the court held that while plaintiffs are not required to plead the existence of feasible-alternative designs, their availability remains a relevant consideration in evaluating strict-product-liability claims. 231 Ill.2d 516, 546 (2008). As the majority discusses here—and as established in Arizona under *Golonka*, *Dart*, and *Gomulka*—a jury's liability assessment may hinge on whether the design defect was unreasonable and whether reasonable alternatives were available at the time of manufacture.

¶33 As we look ahead to the ongoing integration of autonomous systems in our society and cars, plaintiffs may argue that continued production of human-operated cars could be viewed as inherently risky. *See* Iiona Scully et al., *Safety and Regulatory Considerations of Advanced Driver Assistance Systems (ADAS)*, AMERICAN BAR ASSOCIATION, (Mar. 1, 2021), https://www.americanbar.org/groups/tort_trial_insurance_practice/committees/automobile-litigation/safety_regulatory_considerations/ ("Because the adoption of ADAS technology has been largely voluntary and industry-driven, plaintiffs alleging that lack of ADAS technology is a defect can potentially offer defect, negligence, and punitive damages arguments that focus on noncompliance with the state-of-the-art."). And the failure to incorporate these systems may be argued as a design defect, even if a particular consumer is aware of, and wishes to eschew, ADAS features. *See Gomulka*, 155 Ariz. at 242 ("One test of whether a product is unreasonably dangerous is whether its inherent danger exceeds the expectation of the *ordinary* consumer." (emphasis added)); *Golonka*, 204 Ariz. at 582 ¶ 17 (stating that in strict-liability-design cases, "the knowledge revealed by the accident and the evidence presented at trial is additionally imputed to the manufacturer, and the risk/benefit factors are then applied in 'hindsight' to decide whether it was reasonable for a manufacturer with this knowledge to have put the product on the market") (citing *Dart*, 147 Ariz. at 247–48).

¶34 Alternatively, even if ADAS leads to fewer accidents, because ADAS technology shifts driving decisions "from human drivers to automated systems (and their designers), a larger share of the crashes that nonetheless occur will implicate product liability law." Bryant Walker Smith, *Automated Driving and Product Liability*, 2017 MICH. ST. L. REV. 1, 2 (2017). This situation may "conceivably lead to higher prices for automated driving systems, which could lead to slower adoption of these systems, which could lead to crash injuries that could have been prevented by these systems." *Id.* at 6. Our current case law could place us on the path to increasing the cost of ADAS technology dramatically or a situation in which manufacturing a human-operated car is, in itself, a tort. I hesitate to follow that path and, therefore, only concur in the result.

